In the Matter of SHAWANGUNK MOUNTAIN ENVIRONMENTAL ASSOCIATION et al., Appellants, v PLANNING BOARD OF THE TOWN OF GARDINER, Respondent, and PETONE, INC., Intervenor-Respondent.

Third Department, May 17, 1990

APPEARANCES OF COUNSEL

*Herzog, Engstrom, Burke, Koplovitz & Cavalier, P. C. (Andrew W. Gilchrist* of counsel), for appellants.

*Kellar & Kellar (Paul T. Kellar* of counsel), for respondent.

*Jacobowitz & Gubits (Larry Wolinsky* and *George Lithco* of counsel), for intervenor-respondent.

OPINION OF THE COURT

LEVINE, J.

This proceeding was commenced to challenge the validity of a determination under the State Environmental Quality Review Act (ECL art 8) (hereinafter SEQRA) by respondent that a proposed residential subdivision in the Town of Gardiner, Ulster County, had no significant environmental effect (hereinafter the negative declaration) and was, therefore, approved.

The subdivision plan of intervenor, Petone, Inc., provided for some 17 residential lots, finally reduced to 13, within a tract of some 253 acres* located on a mountainside in the Shawangunk Mountain region. A preliminary map was submitted by Petone for approval in March 1988 together with an environmental assessment form (hereinafter EAF). The plan envisaged the extension of a public road up the side of the mountain to serve as the roadway of the subdivision. Various revisions were made in the plan in response to the environmental concerns expressed by respondent's planning consultant and the town's engineering and highway officials. The project was on the agenda of the monthly meetings of respondent from June 18, 1988 to October 18, 1988, when respondent resolved to issue the negative declaration. Petitioners appeal from dismissal of the petition by Supreme Court.

There should be a reversal. It is uncontested that the Shawangunk region where this subdivision is situated is an environmentally important area. It is also agreed to by all parties that the project is a Type I action which, under the regulations of the Department of Environmental Conservation (hereinafter DEC), is deemed more likely to require the preparation of an environmental impact statement (hereinafter EIS) *(see,* 6 NYCRR 617.12 [a]). The highly significant environmental effects of this project were early recognized by respondent's

---

* One lot contained 143 acres, the remaining lots ranged in size from 4 to 17 acres.

planning consultant and other governmental agencies. In May 1988, the Ulster County Soil and Water Conservation District identified potential dangers of pollution from septic fields due to the impermeability and shallowness of the soil in the subdivision, of severe erosion from clearing vegetation and of sediment entering the streams located in the tract. As late as September 5, 1988, respondent's planning consultant, who investigated and reviewed this proposed action from a SEQRA standpoint for respondent, identified in an EAF some seven categories of "potential large impact" and 10 additional aspects of "small to moderate impact" involved in the project. In part 3 of the EAF, respondent's consultant described various measures necessary to mitigate the more serious effects.

According to the consultant's affidavit, by letter of October 18, 1988 Petone submitted revisions of the proposal setting forth new restrictions on lot clearing and grading, improvements in the storm water management system, changes in the design of the subdivision road and a stipulated requirement of individual site plan approval for buildings, septic fields, driveways and stream crossings. The modifications were, in the judgment of respondent's consultant, sufficient to eliminate the significant environmental concerns he had to the point that he could recommend the issuance of a negative declaration, and respondent followed this recommendation at its meeting that evening.

While we have no doubt that respondent and its consultant acted under a good-faith belief that the mitigating measures agreed to by Petone were sufficient to safeguard against adverse environmental risks, the procedure employed to achieve the negative declaration violated both the letter and the spirit of SEQRA and its implementing regulations. "The heart of SEQRA is the Environmental Impact Statement (EIS) process" (Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400, 415). Particularly in a Type I project, there is a relatively low threshold for requiring an EIS (see, H.O.M.E.S. v New York State Urban Dev. Corp., 69 AD2d 222, 232; see also, Chinese Staff & Workers Assn. v City of New York, 68 NY2d 359, 364-365). The EIS process is especially designed to insure the injection of full, open and deliberative consideration of environmental issues into governmental decision-making (Akpan v Koch, 75 NY2d 561, 569). The EIS process guarantees comprehensive review of a project's adverse environmental effects, consideration of less intrusive alternatives to the proposed action, including "no-action", and

consideration of mitigation measures (ECL 8-0109 [2]; 6 NYCRR 617.14 [f]; *Matter of Jackson v New York State Urban Dev. Corp., supra,* at 416). To assure accountability of the lead agency and avoidance of any oversight in that agency's assessments, the regulatory scheme requires public access to the information by making the draft and final EIS available with sufficient lead time to afford interested persons an opportunity to study the project, its environmental effects and proposed mitigating measures, and then comment thereon (ECL 8-0109 [4]; 6 NYCRR 617.8 [c]; 617.9 [a]; *Matter of Jackson v New York State Urban Dev. Corp., supra,* at 415-416). Additional safeguards are found in the substantive requirements that the lead agency must act and choose among alternatives so as to minimize adverse environmental consequences, consistent with other social, economic and policy considerations, and must then make appropriate written findings to that effect (ECL 8-0109 [1], [8]; 6 NYCRR 617.9 [c]; *Matter of Jackson v New York State Urban Dev. Corp., supra,* at 416; *see, Akpan v Koch, supra,* at 570).

Clearly, despite the fact that the project was initially found to entail a substantial number of highly significant environmental risks, i.e., "potential large impact[s]", and its scope as approved remains largely the same as originally proposed, environmental review was cut short by the negative declaration, without the procedural safeguards of the EIS process, and without any assurance that the substantive requirements of SEQRA have been met. Most notably, there was no review of possible alternatives (including no action) which has also been characterized as the "heart of the SEQRA process" (Marsh, *Symposium on the New York State Environmental Quality Review Act Introduction—SEQRA's Scope and Objectives,* 46 Alb L Rev 1097, 1111 [1982]). Nor was the lead time between Petone's submission of final revisions on October 18, 1988 and respondent's approval the same date, sufficient for public disclosure and feedback as would have been the case had environmental review of this project been processed through an EIS.

Respondent's determination was, at best, equivalent to a conditioned negative declaration, a dispositional option only permitted under the regulations for unlisted actions, not Type I actions such as this *(see,* 6 NYCRR 617.2 [h]). Although the negative declaration states that the mitigations respondent found sufficient to eliminate all environmental effects were "proposed by the applicant and made part of the filed applica-

tion", it is abundantly evident from the record that the mitigating measures proposed were concessions extracted from Petone by respondent and its consultant as necessary prerequisites to the issuance of the negative declaration. Indeed, as late as the September 20, 1988 meeting of respondent, Petone's attorney was requesting the members "to make a consensus in regard to the mitigations referred to in the Town Planner's memorandum" which ultimately formed the basis of the negative declaration, and then a vote was taken. Thus, it can hardly be disputed that the mitigating measures were in fact conditions precedent to the negative declaration, fashioned in the first instance by respondent's planning consultant.

For all the foregoing reasons, the negative declaration and subdivision approval cannot stand. In so ruling, we do not necessarily imply that in any Type I action mitigating measures incorporated in the proposal may never justify a negative declaration. Here, however, the environmental risks were identified as pervasive and quite serious and the mitigations, introduced at the behest of the lead agency, did not substantially reduce the scope of the project. Under such circumstances, an EIS was required as a matter of law.

KANE, J. P., WEISS, MIKOLL and YESAWICH, JR., JJ., concur.

Judgment reversed, on the law, with costs, determination annulled, petition granted and matter remitted to respondent for further proceedings not inconsistent with this court's decision.