OPINION OF THE COURT
 

 Smith, J.
 

 We hold that, under certain circumstances, a negative declaration may be issued under the State Environmental Quality Review Act (SEQRA) even where the project — a Type I action — has been modified during the initial review process to accommodate environmental concerns of the lead agency and other interested parties.
 

 In the first case,
 
 Matter of Merson v McNally,
 
 we conclude that the modifications made to the project in response to environmental concerns raised during the Planning Board’s review, were a legitimate product of the process and did not implicitly convert the ultimate determination of nonsignificance into an improperly conditioned negative declaration. Thus, the order of the Appellate Division annulling the negative declaration should be reversed. Since that decision was relied upon by the Appellate Division to dismiss the project developer’s petition in the second action,
 
 Matter of Philipstown Indus. Park v Town Bd.,
 
 a reversal is also appropriate in that case. Each case must be remitted to the Appellate Division for a determination of issues raised but not decided on the appeal to that Court.
 

 I
 

 The cases before us represent two parts of one long story for which the relevant facts will be summarized herein. Philips-town Industrial Park, Inc. (PIP) is the owner of over 80 acres of real property located within an industrial zoning district in the Town of Philipstown, Putnam County, New York. PIP’s development plans for the land included soil mining and reclamation on the southern portion of the parcel.
 

 Prior to PIP’s purchase of the land in 1987, the property had been extensively mined but had not been relandscaped. Under its proposal, about 9.8 acres would again be subject to surface mining which would consist of "sizing” gravel by sifting the material through a portable screen. Another area of about 7.5
 
 *748
 
 acres would not be mined but would be regraded and reclaimed and a third area would be subject to various activities necessary to the operation of the mine. The mining project would result in an expansion of the pond located on the parcel which PIP claims would "yield environmental benefits and recreational opportunities.”
 

 PIP applied to the Department of Environmental Conservation (DEC) for a "mined land reclamation permit” pursuant to New York’s Mined Land Reclamation Law (MLRL; ECL 23-2701 — 23-2727). PIP also applied to the Planning Board for a temporary Town Special Use Mining Permit pursuant to the Town Mining Law. The chapter sets forth certain "standards and conditions” pursuant to which each mining project proposal is to be considered
 
 (see,
 
 art X, § 175-46) and the question' arose whether the local mining law was preempted by the MLRL. Finding no preemption, the Planning Board reviewed the permit application and declared itself the lead agency for purposes of review under SEQRA. The DEC and the Department of Transportation were among the other agencies involved in the review process.
 

 The Planning Board first determined that the mining project qualified as a Type I action under SEQRA because it "involve[d] the physical alteration of 10 acres” (6 NYCRR 617.12 [b] [6] [i]). PIP then submitted a draft of a full Environmental Assessment Form (EAF) pursuant to the SEQRA regulations. During the review process, the Planning Board identified several "potentially large” environmental impacts from the proposed project. In response to concerns raised by the interested agencies, the Planning Board and community members during public meetings and hearings, PIP continually revised portions of its project plans. All of the modifications were discussed and considered by the Planning Board during these open meetings. The entire project proposal was reduced to a single bound volume (which included a completed EAF) and was finally submitted on May 4, 1993.
 

 On May 18, 1993, the Planning Board received an opinion from the DEC that a determination of nonsignificance in the form of a negative declaration would be appropriate for the mining project. Two days later, on May 20, 1993, the Planning Board issued a negative declaration by unanimous vote. The Planning Board also granted the temporary special use permit (subject to the final approval of the Town Board) upon its finding that "the applicant has met or exceeded the performance standards outlined” in the Town Zoning Law. Soon afterward,
 
 *749
 
 a group of community residents filed a CPLR article 78 petition in Supreme Court seeking to annul the negative declaration of the Planning Board and PIP intervened.
 

 Supreme Court dismissed the proceeding and concluded that the determination of the Planning Board was not improperly issued. In so holding, the court found that "the environmental assessment form adequately identified areas of environmental impact.” The court stated that it would "defer to the planning board’s discretion as to the * * * issuance of a negative declaration under SEQRA.”
 

 The Appellate Division reversed and annulled the negative declaration. The Court held (227 AD2d 487, 490):
 

 "Inherent in the Planning Board’s determination was a recognition of significant environmental impacts posed by the intervenor’s project * * *. It is evident that the numerous measures proposed by the intervenor in mitigation of these impacts were conditional prerequisites for the issuance of the negative declaration * * *. Under these circumstances, we conclude that the Planning Board’s negative declaration was the functional equivalent of a conditioned negative declaration” (citations omitted).
 

 On May 25, 1993, PIP wrote to the Town Board to request final approval of the special use permit pursuant to article X, § 175-42 of the Town Zoning Law. Approval was denied by the Town Board on July 12, 1993 based upon various zoning and environmental concerns.
 
 [1]
 
 PIP filed an article 78 proceeding on August 4, 1993 which challenged the right of the Town Board to deny a temporary special use permit for PIP’s project. Supreme Court found in PIP’s favor and granted the petition. The Appellate Division concluded that reversal was mandated by its determination in
 
 Matter of Merson v McNally,
 
 and it reached no other issues raised by the parties.
 

 PIP appeals the ruling of the Appellate Division in
 
 Merson
 
 pursuant to leave granted by this Court, and we now reverse that determination. PIP also appeals the ruling of the Appellate Division in
 
 Philipstown,
 
 again pursuant to leave granted by this Court. PIP principally argues that the Town’s mining
 
 *750
 
 ordinance was preempted by the New York State Mined Land Reclamation Law
 
 (see, Matter of Gernatt Asphalt Prods. v Town of Sardinia,
 
 87 NY2d 668;
 
 Village of Savona v Knight Settlement Sand & Gravel,
 
 88 NY2d 897). We must, however, consider the case in the posture it comes before us. Thus, because the Appellate Division has not addressed the issues of preemption and the propriety of the Town Board’s withholding its approval of the temporary special use permit, we reverse and remit for consideration of these issues, without expressing any view on them.
 

 II
 

 ''SEQRA’s fundamental policy is to inject environmental considerations directly into governmental decision making”
 
 (Matter of Coca-Cola Bottling Co. v Board of Estimate,
 
 72 NY2d 674, 679). This policy is effectuated, in part, through strict compliance with the review procedures outlined in the environmental laws and regulations
 
 (see, Matter of King v Saratoga County Bd. of Supervisors,
 
 89 NY2d 341, 347-348). A SEQRA review process conducted through closed bilateral negotiations between an agency and a developer would bypass, if not eliminate, the comprehensive, open weighing of environmentally compatible alternatives both to the proposed action and to any suggested mitigation measures.
 

 However, we disagree with the Appellate Division’s holding to the extent it can be read to bar
 
 any
 
 significant modification during the review process as a conditioned negative declaration. Instead, we adopt an analysis which allows for consideration of the legitimate maturation of a development project in accordance with the goals of environmental regulation. In exercising our judicial review function concerning the process at issue, we conclude that the determination of nonsignificance made by the lead agency was not improper.
 

 The Regulatory Process Under SEQRA
 

 Under the procedures set forth in the DEC regulations, when a developer first submits a proposal for a particular project, it is determined whether the project qualifies as a Type I, Type II or an unlisted action for purposes of SEQRA review (6 NYCRR 617.5 [a] [4]). For Type I actions, the developer must submit a
 
 *751
 
 full EAF which "must be used to determine the significance of such actions” (6 NYCRR 617.5 [b]).
 
 [2]
 

 The very purpose of an EAF is to assist an agency "in determining the environmental significance or nonsignificance of actions” (6 NYCRR 617.2 [m]). As the form itself states, "[t]he full EAF is intended to provide a method whereby applicants and agencies can be assured that the determination process has been orderly, comprehensive in nature, yet flexible enough to allow introduction of information to fit a project or action” (6 NYCRR 617.20, appendix A). Part 2 of the EAF allows the lead agency to identify "the range of possible impacts” and "whether an impact can be mitigated or reduced” (6 NYCRR 617.20, appendix A). As stated on the required form, "[identifying that an impact will be potentially large * * * does not mean that it is also necessarily significant. Any large impact must be evaluated in Part 3 to determine significance. Identifying an impact in column 2 simply asks that it be looked at further.” This highlights the functional difference between an EAF and an Environmental Impact Statement (EIS). While an EAF is used to determine significance or nonsignificance, the purpose of an EIS is to examine the identified potentially significant environmental impacts which may result from a project
 
 (Matter of Coca-Cola Bottling Co. v Board of Estimate,
 
 72 NY2d, at 680).
 
 [3]
 

 To arrive at its determination of significance, the lead agency must identify "the relevant areas of environmental concern” and take a "hard look” at them
 
 (Matter of Chemical Specialties Mfrs. Assn. v Jorling,
 
 85 NY2d 382, 397;
 
 see also, Matter of Kahn v Pasnik,
 
 90 NY2d 569 [decided today]). The agency must set forth a reasoned elaboration for its determination
 
 (see, Matter of WEOK Broadcasting Corp. v Planning Bd.,
 
 79 NY2d 373, 381;
 
 Matter of Coca-Cola Bottling Co. v Board of Estimate,
 
 
 *752
 
 72 NY2d, at 680). As we have stated, "[w]here an agency fails to take the requisite hard look and make a reasoned elaboration, or its determination is affected by an error of law, or its decision was not rational, or is arbitrary and capricious or not supported by substantial evidence, the agency’s determination may be annulled”
 
 (Matter of WEOK Broadcasting Corp. v Planning Bd.,
 
 79 NY2d, at 383). However, we have also cautioned that "[wjhile judicial review must be meaningful, the courts may not substitute their judgment for that of the agency for it is not their role to 'weigh the desirability of any action or [to] choose among alternatives’ ”
 
 (Akpan v Koch,
 
 75 NY2d 561, 570, quoting
 
 Matter of Jackson v New York State Urban Dev. Corp.,
 
 67 NY2d 400, 416).
 

 Although the parties presently contest issues such as whether the lead agency took a "hard look,” the Appellate Division resolved these cases solely on the ground that modifications made to the project were an improper circumvention of the procedural requirements under the environmental regulations. Thus, that is the threshold critical issue that we must address.
 

 The Impact of Modifications on the SEQRA Process
 

 The dilemma is this — how to permit an evolving process for identification of environmental concerns and initiatives to meet those concerns yet, on the other hand, to guard against an avoidance of the EIS process through private bilateral negotiations between a developer and a lead agency when a project may have potentially significant environmental impacts which need full and open consideration.
 

 To deal with this dilemma, we start with the definition of a conditioned negative declaration, permitted only in unlisted actions: "a negative declaration issued by a lead agency for an unlisted action, involving an applicant, in which the action as
 
 initially proposed may result in one or more significant adverse environmental effects',
 
 however,
 
 mitigation measures identified and required by the lead agency
 
 * * * will modify the proposed action so that no significant environmental impacts will result” (6 NYCRR 617.2 [h] [emphasis supplied]).
 

 Applying this definition in the context of a Type I action, we prescribe a twofold inquiry to examine whether a negative declaration has been impermissibly conditioned: (1) whether the project, as initially proposed, might result in the identification of one or more "significant adverse environmental effects”; and (2) whether the proposed mitigating measures incorporated
 
 *753
 
 into part 3 of the EAF were "identified and required by the lead agency” as a condition precedent to the issuance of the negative declaration.
 

 On the first point, if all areas of concern involve a minimal risk to the environment, no further inquiry is necessary and modifications in these areas would not impermissibly condition or invalidate an otherwise proper negative declaration. However, where the lead agency has identified potentially significant impacts
 
 (see, Chinese Staff & Workers Assn. v City of New York,
 
 68 NY2d 359, 364-365), or where the record supports an inference that the identified impacts would have to be considered potentially significant
 
 (see, Inland Vale Farm Co. v Stergianopoulos,
 
 104 AD2d 395, 397,
 
 affd
 
 65 NY2d 718), or where the identified impacts fall within typically environmentally sensitive areas or locations, the second prong of the test must be examined.
 

 At the second phase of analysis, a court must examine whether the proposed mitigating measures, incorporated as part of an open and deliberative process, negated the project’s potential adverse effects. Under such circumstances, the proposal, as revised, could still result in a determination of non-significance and the issuance of a valid negative declaration. In this regard, mitigating measures could be viewed as part of the "give and take” of the application process, and would be less of a concern than those revisions or mitigation measures made after final submission of the EAF.
 

 However, a lead agency clearly may not issue a negative declaration on the basis of conditions contained in the declaration itself. Nor could the lead agency achieve the same end by other means, such as supporting the negative declaration with a statement that conditions would be imposed only on an underlying special use permit to reduce environmental impacts; extracting concessions from the developer as necessary prerequisites to the issuance of the negative declaration
 
 (Matter of Shawangunk Mtn. Envtl. Assn. v Planning Bd.,
 
 157 AD2d 273, 277); or requiring specific mitigation measures, and then approving a proposal that has been revised in compliance with the mandate of the lead agency.
 

 The environmental review process was not meant to be a bilateral negotiation between a developer and lead agency but, rather, an open process that also involves other interested agencies and the public. Thus, there would ordinarily be no inherent problem in revising or modifying project plans to ad
 
 *754
 
 dress concerns raised during the environmental review, particularly concerns raised by other agencies.
 

 However, mitigating measures will not obviate the need for an EIS unless they clearly negate the continued potentiality of the adverse effects of the proposed action. Otherwise, the EIS process would be necessary to review the adequacy of the mitigating measures, and any environmentally compatible alternatives to the suggested mitigations. The lead agency’s determination of the sufficiency of the proposed mitigation measures would of course be subject to a judicial examination of whether the lead agency took the requisite hard look
 
 (see, e.g., Matter of Kahn v Pasnik,
 
 90 NY2d 569,
 
 supra
 
 [decided today]); the more numerous and significant the environmental impacts identified at the outset, the greater possibility that mitigation measures would not suffice, and an EIS would be required.
 

 Here, the Planning Board, in reviewing part 2 of the EAF identified a number of impacts as "potentially large.” For example, the Town’s planning consultant articulated his concern with "ambient noise level and access to a mining operation through a subdivision.” Indeed, the consultant specifically stated that "the Board must consider the noise issue more in depth as it has been shown to be one of the most complex and important matters in connection with the application” bearing on SEQRA review.
 

 Nevertheless, the agency’s general concerns relating to noise levels were alleviated through the review process by the actions of, and open discussions with, the developer. In response to such concerns, PIP explained that it had taken several surveys and readings of the ambient noise in the area of the mining operation and, as a result of its analysis, PIP concluded that "an ambient noise level within the guidelines of the [local] zoning law will be maintainable by the mining operation.” Additionally, in this regard, the agency suggested that Saturday hours and operations be limited only to the sale of materials and the developer agreed.
 

 A similar open and deliberative process surrounded the concerns raised by the increased traffic stemming from the project. The Board suggested that the developer "consider” a separate access road and the mining plan was amended in response to such comments. PIP pursued a temporary access route onto Route 9 and other measures to lessen the traffic on residential streets.
 

 
 *755
 
 Another example of legitimate modifications being made surrounds the concerns raised about groundwater and possible contamination around the aquifer, typically an environmentally sensitive area. In a Townwide Aquifer Study published after PIP initially submitted its permit application, a minimum of eight feet of overburden was recommended for placement above seasonal high groundwater elevation to alleviate concerns associated with the subsurface sewage disposal system. Although PIP’s original plans called for six feet of overburden, PIP modified its plans to incorporate two additional feet of overburden when it reviewed the report. This modification negated the potential adverse effects.
 

 Thus, the modifications here were not conditions unilaterally imposed by the lead agency, but essentially were adjustments incorporated by the project sponsor to mitigate the concerns identified by the public and the reviewing agencies, with only minor variations requested by the lead agency during the review process. Of distinguishing dispositive import here is that the modifications were examined openly and with input from all parties involved. This process comports with the overriding purposes of SEQRA.
 

 The revisions thus came about as part of the review process and were submitted and publicly evaluated prior to the issuance of the negative declaration. Moreover, the lead agency properly sought the views of other interested agencies before making a final determination regarding significance. In fact, the DEC issued its recommendation of nonsignificance based upon the final revised project plans in accordance with the regulations
 
 (see,
 
 6 NYCRR 617.3 [e]). These considerations combine to support the conclusion that the negative declaration in this case was not improperly conditioned.
 

 This case illustrates the practical reality that a project, especially a large undertaking such as a Type I action, usually undergoes modifications from its initial specifications. Modifications made to a project during the review process should not necessarily be characterized as impermissible "conditions.” Indeed, the SEQRA regulations themselves help to show that the purpose of identifying "potentially large” environmental impacts in the midst of the EAF process is to allow a developer the opportunity to address those potential impacts in the project proposal.
 

 In sum, the mere circumstance that modifications may have been made to a proposal is an insufficient basis to nullify a
 
 *756
 
 negative declaration otherwise properly issued. What is dispositive is the character and source of the identified modifications. The SEQRA process here was conducted openly and deliberatively. Moreover, the agency’s elaboration of the basis for its determination of nonsignificance is reasonable.
 

 Accordingly, in each case, the order of the Appellate Division should be reversed, with costs, and the matter remitted to the Appellate Division for further proceedings in accordance with this opinion.
 

 Chief Judge Kaye and Judges Titone, Bellacosa, Levine, Ciparick and Wesley concur.
 

 In each case: Order reversed, etc.
 

 [1]
 

 . On November 5, 1993, the DEC issued a State Mining Permit and, in a letter addressed to "Town Supervisor & Concerned Citizens,” the DEC explained why the environmental concerns raised in the Town Board’s denial of a special use permit were without merit.
 

 [2]
 

 . The agency may waive the requirement of an EAF if a draft EIS is submitted instead (6 NYCRR 617.6 [a] [4]).
 

 [3]
 

 . As stated in the current regulations, "[a]n EIS provides a means for agencies, project sponsors and the public to systematically consider significant adverse environmental impacts, alternatives and mitigation” (6 NYCRR 617.2 [n]). If the lead agency determines "that the action may include the potential for at least one significant environmental effect” (6 NYCRR 617.6 [g] [1] [i]), the agency must issue a positive declaration (6 NYCRR 617.2 [cc];
 
 Matter of Coca-Cola Bottling Co. v Board of Estimate,
 
 72 NY2d, at 680). However, when the agency determines that "the implementation of the action as proposed will not result in any significant environmental effects,” the agency may issue an unqualified negative declaration
 
 (see,
 
 6 NYCRR 617.2 [y]).