■ In the Matter of ELIOT SPITZER, as Attorney General of the State of New York, Appellant, v KEVIN FARRELL et al., Respondents. [742 NYS2d 285] —Order, Supreme Court, New York County (Stanley Parness, J.), entered October 13, 2000, which denied petitioner-appellant's CPLR article 78 petition to annul a negative declaration issued by respondent New York City Department of Sanitation under the State Environmental Quality Review Act, unanimously reversed, on the law, without costs, the petition granted to the extent of annulling the negative declaration, and respondent directed to conduct a new environmental assessment.

In May 1996, the New York State Legislature adopted an amendment to the Environmental Conservation Law, requiring New York City to close the Fresh Kills landfill on Staten Island by January 1, 2002. In order to comply with this mandate, New York City's Department of Sanitation (DOS) began to reduce the amount of waste deposited in Fresh Kills by implementing interim measures that would continue until the City adopted a final strategy for disposing of the thousands of tons of garbage it collected daily. In 1999, the DOS implemented an interim plan to deal with the approximately 2,300 tons of solid waste it collects in Manhattan each day. Pursuant to this plan, the trash collected in Manhattan would be transported to solid-waste facilities in New Jersey. The plan calls for anywhere from 393 to 650 diesel-powered sanitation trucks to carry their collected trash each day to New Jersey and return to Manhattan via the George Washington Bridge and the Holland and Lincoln Tunnels.

Prior to implementing the plan to transport Manhattan's waste to New Jersey, the DOS was required by the State Environmental Quality Review Act (SEQRA), article 8 of the Environmental Conservation Law (ECL), to assess whether the plan necessitated the preparation of an environmental impact statement (EIS). SEQRA was enacted "to promote efforts which will prevent or eliminate damage to the environment and enhance human and community resources." (ECL 8-0101.) Toward that end, the Legislature directed that "all agencies conduct their affairs with an awareness that they are stewards of the air, water, land, and living resources, and that they have an obligation to protect the environment for the use and enjoyment of this and all future generations." (ECL 8-0103 [8].)

To ensure that government agencies incorporate environmental and health considerations into their decision-making, SEQRA requires them to review the environmental impacts of

any nonexempt "action"* they propose to undertake and to prepare an environmental impact statement for any action that *"may* have a significant effect on the environment." (ECL 8-0109 [2] [emphasis added]; 8-0105 [2], [3]; *see also, Chinese Staff & Workers Assn. v City of New York,* 68 NY2d 359, 364-365.) "Because the operative word triggering the requirement of an EIS is 'may', there is a relatively low threshold for the preparation of an EIS" *(Matter of Omni Partners v County of Nassau,* 237 AD2d 440, 442). Agencies are required to "minimize or avoid adverse environmental effects" identified in the EIS "to the maximum extent practicable" (ECL 8-0109 [1]).

If a proposed action poses no potentially significant adverse impacts on the environment, the agency may issue a "negative declaration" and proceed with the action without going through the EIS process. However, before it may issue a negative declaration, the agency "must identify 'the relevant areas of environmental concern' and take a 'hard look' at them * * * [and] set forth a reasoned elaboration for its determination." *(Matter of Merson v McNally,* 90 NY2d 742, 751; *see also, Matter of Jackson v New York State Urban Dev. Corp.,* 67 NY2d 400, 417; 6 NYCRR 617.7 [b].) SEQRA does not provide any "magical formula or set of fixed objective standards for determining the environmental significance of an action." (1 Gerrard, Ruzow & Weinberg, Environmental Impact Review in New York § 2.06 [2], at 2-110 [2001].) Instead, the agency must identify and thoroughly analyze the relevant areas of environmental concern (6 NYCRR 617.7 [c] [1]) and determine if the proposed action may have a significant adverse impact on those areas.

In conjunction with its obligation under SEQRA, the DOS undertook an initial environmental assessment to determine if adding several hundred diesel-powered trucks to three of Manhattan's already heavily congested exit and entrance points might have a significant adverse impact on the environment. Diesel engines emit a number of pollutants into the air, including "[p]articulate matter," which is a " 'generic term for a broad class of chemically and physically diverse substances that exist as discrete particles (liquid droplets or solids) over a wide range of sizes.' " *(Matter of UPROSE v Power Auth. of State of N.Y.,* 285 AD2d 603, 607, *lv denied* 97 NY2d 605,

---

* Under SEQRA, "actions" include "projects or activities directly undertaken by any agency." (ECL 8-0105 [4] [i].) There is no dispute that DOS's plan to dispose of Manhattan garbage constitutes an "action" within the meaning of SEQRA.

quoting Wooley, Clean Air Handbook, at 1-14 n 15 [9th ed] [intermediate citation omitted].) Particulate matter is measured in microns. A micron is one millionth of a meter; a human hair is approximately 70 microns in diameter. Once airborne, particulate matter can enter the lungs through respiration and cause or aggravate pulmonary health conditions, such as asthma. The finer the particles, the deeper they may penetrate into the lungs and the more likely they are to contribute to adverse health effects. More than 90% of the particulate matter in diesel-engine emissions consists of particles measuring 2.5 microns or less in diameter, which is referred to as "PM2.5." Hence, one of the environmental issues facing DOS was whether its plan would have a significant adverse impact on the air quality in the affected areas.

Focusing on the impact in the area around the Holland Tunnel as the point of the plan's "worst case scenario," the DOS concluded that the proposed plan "would not cause a potentially significant adverse traffic-related air quality impact * * * [and] no adverse public health impacts would occur as a result of this [plan]." The DOS limited its inquiry to and based its conclusion on whether the exhaust from the diesel-powered garbage trucks would increase the level of PM10 in the air to a degree that would constitute a violation of the Federal Clean Air Act.

Section 109 of the Clean Air Act (42 USC § 7409 [a]) requires the Federal Environmental Protection Agency (EPA) to promulgate National Ambient Air Quality Standards (NAAQS) for all "criteria" air pollutants, which are pollutants that the EPA has determined "cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare." (42 USC § 7408 [a] [1] [A].) Particulate matter is one of the "criteria" air pollutants for which EPA has adopted NAAQS. Prior to 1997, NAAQS were maintained for particulate matter measuring 10 microns in diameter—PM10. However, after reviewing the most recent scientific data, the EPA concluded in 1997 that the existing PM10 standards did not adequately protect public health (62 FR 38652, 38665 [July 18, 1997]) and adopted a new NAAQS for PM2.5. (62 FR 38652.) The EPA determined that PM2.5 emissions contributed to a number of adverse health effects, including "premature mortality and increased hospital admissions and emergency room visits, primarily in the elderly and individuals with cardiopulmonary disease; increased respiratory symptoms and disease, in children and individuals with cardiopulmonary disease such as asthma; decreased lung function, particularly in children

and individuals with asthma; and alterations in lung tissue and structure and in respiratory tract defense mechanisms." (62 FR 38652 [July 18, 1997].) In conjunction with its adoption of PM2.5 NAAQS, the EPA issued an Implementation Plan that called for three years of monitoring and data collection before the new standards would be enforced.

Despite the EPA's determination that PM10 NAAQS were inadequate measures of the adverse effects of PM pollution—two years before the DOS began implementation of its plan to dispose of Manhattan waste—the DOS ignored the potential PM2.5 impact of its plan and based its determination that the plan would have no adverse environmental impact solely on the outdated PM10 NAAQS. In doing so, DOS—and the IAS court—erroneously equated "significance" under SEQRA with compliance with enforceable, albeit concededly inadequate, PM10 NAAQS promulgated under the Federal Clean Air Act.

Determination under SEQRA of whether an agency action "may have a significant effect on the environment" (ECL 8-0109 [2]), and thus whether an EIS is required, is a much broader undertaking than simply determining whether such action might violate air quality standards promulgated as a regulatory matter under the Clean Air Act. The absence of legally enforceable PM2.5 NAAQS under the Clean Air Act does not relieve DOS of its obligation to consider potential PM2.5 impacts under SEQRA. (*See, e.g., Chinese Staff & Workers Assn.*, 68 NY2d at 368 [secondary displacement, for which no legally enforceable standards exist, must be analyzed under SEQRA]; *see also, South Camden Citizens in Action v New Jersey Department of Envtl. Protection*, 145 F Supp 2d 446, 464 [D NJ 2001], *revd on other grounds* 274 F3d 771 [3d Cir 2001] [characterizing as "disingenuous" New Jersey's failure to analyze PM2.5 impacts simply because EPA's PM2.5 NAAQS were not yet legally enforceable].)

DOS argues, unconvincingly, that it was unable to analyze the plan's potential PM2.5 impacts because the EPA had not adopted a national method to determine compliance with its PM2.5 NAAQS at the time DOS issued its negative declaration. However, DOS provided no evidence that no analysis sufficient to meet SEQRA's requirements was possible. Nor did it adequately refute the efficacy of petitioner's analytical suggestions. Moreover, as petitioner notes, even if there were no means of fully assessing the plan's PM2.5 impacts, DOS was not justified in simply ignoring the issue. Given the structure and purpose of SEQRA, any uncertainty as to the assessment of the environmental impact of an agency's action

should normally lead to the conclusion that an EIS is required—particularly where, as here, the action involves issues of recognized air pollutants.

Judicial review of an agency's SEQRA determination is limited to whether the determination was made in violation of lawful procedure, was affected by error of law or was arbitrary and capricious or an abuse of discretion (*Akpan v Koch*, 75 NY2d 561, 570). If it is determined upon review of the administrative record that the agency failed to identify the relevant areas of environmental concern properly or to take the requisite "hard look" at those areas, the agency's determination may be annulled. (*Matter of Merson v McNally*, 90 NY2d 742, 752.)

In making its determination that its plan for dealing with Manhattan waste would have no adverse environmental or health effects, DOS failed to identify—much less to take a "hard look at" the plan's potential PM2.5 impact—clearly a "relevant area[ ] of environmental concern" (*Matter of Merson v McNally*, 90 NY2d 742, 751 [citations omitted]). Such failure was contrary to SEQRA's mandates and, thus, DOS's negative declaration must be annulled. The DOS is directed to conduct a new environmental assessment that will address all relevant environmental concerns, including PM2.5 emissions. Concur—Williams, P.J., Andrias, Buckley and Rosenberger, JJ.