*239 OPINION OF THE COURT
Ciparick, J.
This appeal presents two issues for our review. The threshold question is whether the action of the Town of Southampton Coastal Erosion Hazard Board of Review is ripe for judicial review. If so, we must then address whether the Board was bound by the prior negative declaration issued by the Department of Environmental Conservation (DEC) acting as lead agency in a coordinated State Environmental Quality Review Act (SEQRA) review. We hold that the action of the Board is ripe for review and that the Board is bound by the prior negative declaration.
Storms during the winter of 1992-1993 caused substantial erosion to the beaches in Bridgehampton, in the Town of Southampton. As a result, in March 1993 petitioners — a group of oceanfront property owners — requested permission from the Town to install shore-hardening structures, steel bulkheads, on the seaward toe of the primary dune to prevent further erosion.[1] Petitioners asked that this project be undertaken as an emergency measure.
The Town of Southampton “assume [d] the responsibility and authority to implement and administer a coastal erosion management program * * * [including] [r]egulat[ing] the construction of erosion protection structures in coastal areas” under its Coastal Erosion Hazard Area Law (CEHA) (Code of Town of Southampton § 138-3 [E]). The Administrator of the CEHA is the Town official responsible for implementing and enforcing that law and issuing all permits {see Code of Town of *240 Southampton § 138-28 [D]). The Administrator notified petitioners that the proposed projects would not be eligible for emergency status and that they would have to proceed through the standard permitting process.
Petitioners then submitted permit applications to install these structures indicating their willingness to bear the responsibility for dune restoration when required after periods of erosion. The permit applications were made both to the Administrator under the CEHA and to the DEC. The Administrator was the designated liaison with the DEC (see Code of Town of Southampton § 138-28 [H]), which also had jurisdiction over the proposal since the bulkheads were proposed to be built on the seaward side of the primary dune, within tidal wetlands. The DEC is responsible for issuing permits for activities regulated by the Tidal Wetlands Act (see ECL art 25).
In April 1993, the Town, through the CEHA Administrator, advised the DEC that it did not wish to assume lead agency status for coordinated SEQRA review purposes because the impacts of the project could have significance beyond the local level and requested that the DEC be lead agency, since it could provide a more thorough environmental assessment. The DEC agreed to assume lead agency status, classified the proposed action as unlisted and in June of 1993 notified petitioners, copying the Administrator, that based upon a preliminary review, a positive declaration probably would be issued. The DEC further indicated that there was also the possibility of a negative declaration if any of three proposed mitigation measures was implemented. Petitioners adopted the third suggestion and submitted modified applications to the DEC, moving the site of the proposed bulkheads landward of the primary dune.[2]
In August 1993, the DEC issued negative declarations for the proposed activities, finding that an environmental impact statement (EIS) did not have to be prepared because there would not be a significant impact on the environment and identifying the Town and the Board of Trustees[3] as involved agencies. Copies of the negative declarations were provided to *241 the Administrator. The DEC issued wetlands permits to the petitioners in September 1993.
Petitioners then submitted the amended applications to the Administrator, who denied the coastal erosion permits because the modification to the proposal, placing the bulkheads landward of the primary dune, was prohibited by the Town Code (see Code of Town of Southampton § 138-12 [B] [1] [fl). Petitioners appealed this decision to the Board.[4] They requested review of the Administrator’s determination and, if necessary, variances to allow them to construct the bulkheads. After a public hearing, the Board issued a resolution in February 1994 stating that it would assume jurisdiction to conduct de novo SEQRA review of the variance applications, would take steps to establish a lead agency and would make a determination of significance. The Board asserted it had not been included as an involved agency and did not have a chance to contribute to the review process.
Petitioners then commenced a CPLR article 78 proceeding and declaratory judgment action — the Gordon v Matthew action — challenging the Board’s decision. Supreme Court granted petitioners’ request for an order of mandamus to compel the Board to review the denial of permits by the Administrator. The court also annulled the Board’s determination that it had the authority to conduct a new SEQRA review, because of insufficient facts and evidence in the record to support the Board’s decision, and remitted the matter to the Board for further proceedings. Supreme Court, however, denied petitioners’ request for an order of prohibition to enjoin the Board from taking any further acts concerning these permits under SEQRA.
On remand, the Board conducted further public hearings and in January 1995, issued a resolution declaring itself lead agency to conduct its own SEQRA review and a positive declaration, finding that the proposed structures could have significant effects on the environment and requiring petitioners to prepare a draft environmental impact statement (DEIS).[5] Petitioners then commenced the present article 78 proceeding *242 challenging the Board’s determination. Supreme Court found that the proceeding was ripe for review and annulled the Board’s resolution, noting that the DEC had strictly complied with SEQRA when it conducted the coordinated review. The court also stated that in light of the Board’s failure to object or to bring its concerns to the DEC’s attention it could not be allowed to commence its own subsequent SEQRA review.
The Appellate Division affirmed, agreed that the issue was a justiciable controversy ripe for review, and held that the Board was “bound by the DEC’s negative declaration, and may not perform their independent subsequent SEQRA review” (299 AD2d 20, 28 [2002]). The Court also found that the Board should have commenced a timely article 78 proceeding if it wished to challenge the determination of the DEC. This Court granted the Board leave to appeal, and we now affirm.
The first question presented for review is whether this proceeding challenging the Board’s January 19, 1995 issuance of a positive declaration is ripe for judicial review. Whether the agency action is ripe for review depends upon several considerations. First, the action must “impose an obligation, deny a right or fix some legal relationship as a consummation of the administrative process” (Matter of Essex County v Zagata, 91 NY2d 447, 453 [1998], quoting Chicago & S. Air Lines v Waterman S.S. Corp., 333 US 103, 113 [1948]).* *[6] In other words, “ ‘a pragmatic evaluation [must be made] of whether the “decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury” ’ ” (Essex County, 91 NY2d at 453 [citations omitted]). Further, there must be a finding that the apparent harm inflicted by the action “may not be ‘prevented or significantly ameliorated by further administrative action or by steps available to the complaining party’ ” (Essex County, 91 NY2d at 453 [citations omitted]).
Here, the decision of the Board clearly imposes an obligation on petitioners because the issuance of the positive declaration requires them to prepare and submit a DEIS. Conducting a “pragmatic evaluation” of these facts and circumstances, the obligation to prepare a DEIS imposes an actual injury on petitioners as the process may require considerable time and expense. The Board would like us to adopt a bright-line rule, *243 adopted by some appellate courts, that a positive declaration requiring a DEIS is merely a step in the agency decisionmaking process, and as such is not final or ripe for review (see e.g. Matter of Rochester Tel. Mobile Communications v Ober, 251 AD2d 1053, 1054 [4th Dept 1998]). Here, the Board issued its own positive declaration for the project after the DEC had previously conducted a coordinated review resulting in a negative declaration, in which the Board had an opportunity but failed to participate. Certainly in this circumstance the bright-line rule advanced by the Board would be inappropriate. In addition, further proceedings would not improve the situation or lessen the injury to petitioners. Even if the Board ultimately granted the variances, petitioners would have already spent the time and money to prepare the DEIS and would have no available remedy for the unnecessary and unauthorized expenditures.
We recognize that the Board may not have had jurisdiction to conduct its own SEQRA review and “an agency’s erroneous assertion of jurisdiction may ultimately never cause any real injury” (Essex County, 91 NY2d at 455). Here, the mere assertion of jurisdiction alone was not the actual, concrete harm that was inflicted upon petitioners. Rather, the harm was the issuance of the positive declaration directing petitioners to prepare a DEIS, involving the expenditure of time and resources, after petitioners had already been through the coordinated review process and a negative declaration had been issued by the DEC as lead agency. As a result, the Board’s action in issuing a positive declaration is a final administrative action ripe for judicial review.
Turning to the merits, we conclude that the Board was bound by the negative declaration issued by the lead agency, the DEC. The DEC properly identified the involved agencies at the beginning of the process and conducted an appropriate coordinated review (see 6 NYCRR 617.6 [c] [Nov. 1987 regulations]; see also 6 NYCRR 617.6 [b] [3] [current regulations]). Under the circumstances of this case, it is insignificant that the modification to the permit application may have changed the Board’s status from that of an interested agency[7] (see 6 NYCRR 617.2 [u] [Nov. 1987 regulations]; see also 6 NYCRR *244 617.2 [t] [current regulations]) to that of an involved agency* *[8] (see 6 NYCRR 617.2 [t] [Nov. 1987 regulations]; see also 6 NYCRR 617.2 [s] [current regulations]). The DEC acted as lead agency for the coordinated review at the request of the Administrator, who surrendered the Town’s lead agency status. The Administrator, as the primary liaison with the DEC under the CEHA (see Code of Town of Southampton § 138-28 [H]), received copies of both the DEC’s letter to petitioners listing the modification options and the negative declarations. As such, the Board had notice of these matters and failed to advise the DEC of any relevant concerns, as it should have done pursuant to the SEQRA regulations (see 6 NYCRR 617.3 [i] [Nov. 1987 regulations]; see also 6 NYCRR 617.3 [e] [current regulations]).
The Board did not make its objections known until after it received copies of the negative declarations and tidal wetlands permits issued by the DEC. The Board’s decision to conduct its own SEQRA review was unauthorized as it was bound by the DEC’s negative declaration, which properly identified the involved agencies through “due diligence” and apprised those agencies of its decision (see 6 NYCRR 617.6 [b] [3] [iii] [current regulations]; see also 6 NYCRR 617.3 [h] [Nov. 1987 regulations]).
In order to challenge the DEC’s issuance of the tidal wetlands permits, upon the completion of the coordinated SEQRA review and issuance of the negative declaration, the appropriate action would have been for the Board to commence a timely article 78 proceeding (see ECL 25-0404; CPLR 217 [1]).
However, as the Appellate Division found, there is record evidence that the DEC took the necessary “hard look” at “the relevant areas of environmental concern” (see Matter of Merson v McNally, 90 NY2d 742, 751 [1997] [citations omitted]). The DEC reviewed the relevant evidence and only approved the action on condition that petitioners would be required to remediate any damage caused by further erosion. The DEC’s decision to issue the negative declaration was not irrational, an abuse of discretion, or arbitrary and capricious and, consequently, *245 should not be disturbed (see Merson, 90 NY2d at 752, citing Matter of WEOK Broadcasting Corp. v Planning Bd., 79 NY2d 373, 383 [1992]). Since the Board was bound by the DEC’s negative declaration, it acted outside the scope of its authority when it decided to conduct its own SEQRA review and issued a positive declaration.
Accordingly, the order of the Appellate Division should be affirmed, with costs.
Chief Judge Kaye and Judges Smith, Wesley, Rosenblatt, Graffeo and Read concur.
Order affirmed, with costs.

. The bulkheads were to consist of 30 feet of steel sheeting, of which 18 feet would be underground and 12 feet aboveground. In addition, boulders, each two to five tons in weight, would be placed in front of the sheeting and the entire structure would be covered by sand.

. The Bridgehampton Tennis and Surf Club, Inc. proposed to install a stone revetment, an alternative protective structure.

. To build a coastal erosion structure at that location, a permit is also required from the Southampton Board of Trustees who have a right of way between the high water mark of the Atlantic Ocean and the crest of the primary dune (Code of Town of Southampton §§ 111-30, 111-31).

. The Board, made up of the same members as the Town Zoning Board of Appeals, has the authority to grant variance requests and hear appeals of the Administrator’s decisions pursuant to the CEHA (see Code of Town of Southampton § 138-23).

. “A draft EIS is the initial statement prepared by either the applicant or the lead agency and circulated for review and comment” (6 NYCRR 617.2 [n] [Nov. 1987 regulations]; see also 6 NYCRR 617.2 [n] [current regulations]). *242 The November 1987 regulations govern this proceeding because they were the regulations in place at the time of the agencies’ actions.

. The considerations applied to the finality analysis in Essex County also apply to a ripeness analysis (see Essex County, 91 NY2d at 454 n).

. An interested agency is “an agency that lacks the jurisdiction to fund, approve or directly undertake an action but wishes to participate in the review process because of its specific expertise or concern about the proposed action. An interested agency has the same ability to participate in the review *244 process as a member of the public” (6 NYCRR 617.2 [u] [Nov. 1987 regulations]).

. An involved agency is “an agency that has jurisdiction by law to fund, approve or directly undertake an action. If an agency will ultimately make a discretionary decision to fund, approve or undertake an action, then it is an ‘involved agency”, notwithstanding that it has not received an application for funding or approval at the time the SEQR process is commenced” (6 NYCRR 617.2 [t] [Nov. 1987 regulations]).