In the Matter of INCORPORATED VILLAGE OF POQUOTT et al., Appellants, v JOHN CAHILL et al., Respondents. [782 NYS2d 823]—

In a hybrid proceeding pursuant to CPLR article 78 and an action pursuant to CPLR 3001, inter alia, to review the determinations of (1) the Long Island Power Authority dated November 13, 2001, which issued a negative declaration under the State Environmental Quality Review Act regarding the construction and operation of two natural gas-powered turbine electric generators adjacent to the Port Jefferson Power Station in Suffolk County, (2) the New York State Department of Environmental Conservation dated January 11, 2002, which issued the requisite air state facility permit, acid rain permit, and state pollutant discharge elimination system permit, (3) the New York State Board on Electric Generation Siting and the

Environment dated December 10, 2001, which declared that the new generating facility was exempt from the review procedures set forth in the Public Service Law article X, (4) the State of New York Public Service Commission dated December 18, 2001, which granted a certificate of public convenience and necessity for the new generating facility, and (5) the Long Island Power Authority dated March 18, 2002, which condemned a 1.5-acre site for the new generating facility, the petitioners appeal from an order and judgment (one paper) of the Supreme Court, Suffolk County (Lifson, J.), dated February 24, 2003, which, upon severing the claim against the State of New York Public Service Commission, dismissed each of the remaining claims in the amended combined petition and complaint, declared that the challenged determinations were either lawful or beyond the Supreme Court's jurisdiction to review, and granted the respondent Long Island Power Authority's motion for an award of its costs and disbursements.

Ordered that the order and judgment is modified, on the law and as a matter of discretion, by deleting the provision thereof granting the motion of the Long Island Power Authority for an award of costs and disbursements, and substituting therefor a provision denying that motion; as so modified, the order and judgment is affirmed, without costs or disbursements.

In 2001 the Long Island Power Authority (hereinafter LIPA) formulated a plan, known as the Summer 2002 Combustion Turbine Generation Project (hereinafter the Project), to help meet increased summertime demand for energy on Long Island. The Project called for the installation of nine General Electric LM-6000 simple-cycle natural gas-powered combustion turbine generators at five sites in Nassau and Suffolk Counties. As part of the Project, LIPA selected KeySpan Energy Development Corp. (hereinafter KeySpan) to construct and operate two generators at the Port Jefferson Energy Center (hereinafter the Energy Center), which was to be located on a site adjacent to the Port Jefferson Power Station (hereinafter the Power Station) on the western shore of Port Jefferson Harbor in Suffolk County.

Pursuant to the New York State Environmental Quality Review Act (ECL art 8 [hereinafter SEQRA]), LIPA notified the agencies involved in the approval process and designated itself as the lead agency for the purpose of conducting a coordinated SEQRA review of the Project. Shortly thereafter, LIPA prepared an Environmental Assessment Form and related attachments (hereinafter the EAF) and issued a negative declaration based on its finding that "no significant adverse environmental

impacts would result from any of the proposed facilities or from all five facilities considered together."

Subsequently, following a public hearing and a 30-day comment period, the New York State Department of Environmental Conservation (hereinafter the DEC) issued the necessary air and water pollution control permits for the Energy Center. In addition, the Public Service Commission issued a certificate of public convenience and necessity, the New York State Board of Electric Generation Siting and the Environment (hereinafter the Siting Board) issued a declaratory ruling that the Energy Center was exempt from the review procedures set forth in article X of the Public Service Law, and LIPA condemned a 1.5-acre parcel adjacent to the existing Power Station to house the Energy Center.

The petitioners, who are the Village of Poquott, two of its residents, and a health care organization, commenced this hybrid proceeding pursuant to CPLR article 78 and action pursuant to CPLR 3001, inter alia, to declare invalid (1) the negative declaration issued by LIPA, (2) the DEC determinations to issue air and water permits relating to the operation of the Energy Center, (3) the declaratory ruling issued by the Siting Board, and (4) the condemnation of the selected 1.5-acre site for the Energy Center. Upon severing a claim against the Public Service Commission, the Supreme Court dismissed each of the claims remaining in the amended petition, declared that the challenged actions were either lawful or beyond the court's jurisdiction, and granted LIPA's request for an award of its costs and disbursements. This appeal followed.

The Supreme Court properly rejected the petitioners' challenge to LIPA's designation as the lead agency for purposes of the SEQRA review. The respondents established that, with the exception of a small portion of its access road already subject to an easement, the Energy Center was located entirely outside the Village of Poquott. As the Village did not have the "jurisdiction by law to fund, approve or directly undertake" any portion of the Project, it was not an "involved agency" within the meaning of 6 NYCRR 617.2 (s), and, therefore, was not entitled to notice that a lead agency was to be established, or to participate in or challenge LIPA's selection as lead agency (see 6 NYCRR 617.6 [b] [3], [5]). At best, the Village was an "interested agency," which had no greater right to participate in the review process than any member of the public would have (see 6 NYCRR 617.2 [t]).

The Supreme Court also properly refused to set aside the negative declaration. LIPA determined early on that the Project

was a Type I action, and therefore was presumed likely to have a significant adverse impact on the environment (*see* 6 NYCRR 617.4 [a] [1]). Because SEQRA mandates the preparation of an Environmental Impact Statement (hereinafter EIS) whenever a proposed project may have a significant effect on the environment (*see* ECL 8-0109 [2]), an EIS is presumptively required for Type I actions (*see Matter of Friends of Port Chester Parks v Logan,* 305 AD2d 676, 677 [2003]). Nevertheless, where the lead agency, after taking a "hard look" at relevant environmental concerns, determines that the project will have no significant adverse environmental impacts, and issues a negative declaration to that effect, the EIS may be dispensed with as unnecessary, even for a Type I action (*see Matter of Forman v Trustees of State Univ. of N.Y.,* 303 AD2d 1019, 1020-1021 [2003]; *Matter of Cathedral Church of St. John the Divine v Dormitory Auth. of State of N.Y.,* 224 AD2d 95, 100 [1996]; *Matter of Save the Pine Bush v Planning Bd. of Town of Guilderland,* 217AD2d 767, 769; 6 NYCRR 617.7 [a] [2]).

Here, the extensive record reveals that LIPA complied with the procedural and substantive requirements of SEQRA both in determining that the Project would have no significant adverse environmental impacts and in issuing the negative declaration. The EAF included a comprehensive report prepared by Key-Span's environmental consultant, TRC Environmental Corporation, that identified and reviewed in detail the areas of environmental concern relevant to the Energy Center, including air emissions, noise, waste water discharges, waste generation and disposal, visual resources, environmental justice concerns, traffic, on-site ammonia storage, and consistency with the New York State Coastal Management Program. The EAF also considered the cumulative impact of the Energy Center and the four other proposed combustion turbine facilities included as part of the Project, as well as the impact of the Energy Center's location adjacent to the existing Power Station.

In reviewing the negative declaration, a court may not substitute its own judgment for that of LIPA by weighing the desirability of particular actions or by choosing among possible alternatives (*see Akpan v Koch,* 75 NY2d 561, 570 [1990]; *Matter of Jackson v New York State Urban Dev. Corp.,* 67 NY2d 400, 416 [1986]). Instead, judicial review is strictly limited to whether LIPA identified the relevant areas of environmental concern, took a "hard look" at them, and made a "reasoned elaboration" of the basis of its determination (*Matter of New York City Coalition to End Lead Poisoning v Vallone,* 100 NY2d 337, 348 [2003]; *Matter of Jackson v New York State Urban Dev. Corp., supra* at 417).

The petitioners did not come forward with the type or quality of evidence that would have warranted disturbing LIPA's determination issuing the negative declaration. The petition did not establish that LIPA failed to take the requisite "hard look" at the relevant areas of environmental concern, or that it failed to make a reasoned elaboration of the basis for its determination. Nor did the petitioners show that LIPA's decision to issue a negative declaration was irrational, arbitrary and capricious, or affected by error of law, or not supported by substantial evidence (*see Matter of Merson v McNally,* 90 NY2d 742, 752 [1997]; *Matter of WEOK Broadcasting Corp. v Planning Bd. of Town of Lloyd,* 79 NY2d 373, 383 [1992]).

Moreover, the petitioners' challenge failed to establish that the negative declaration was impermissibly conditioned. A determination to issue a negative declaration in the case of a Type I action may properly take into account measures included in a project's design specifically for the purpose of mitigating environmental impacts, provided that such mitigating measures are incorporated as part of an open and deliberative process (*see Matter of Merson v McNally, supra* at 753) and that the resulting negative declaration "is not the product of closed-door negotiations or of the developer's compliance with conditions unilaterally imposed by the lead agency" (*Matter of Village of Tarrytown v Planning Bd. of Vil. of Sleepy Hollow,* 292 AD2d 617, 619-620 [2002]; *see also Matter of S.P.A.C.E. v Hurley,* 291 AD2d 563 [2002]; *Matter of Shawangunk Mtn. Envtl. Assn. v Planning Bd. of Town of Gardiner,* 157 AD2d 273 [1990]).

Here, the EAF properly took account of the anticipated effect of various measures intended to mitigate the environmental impact of the Energy Center, including yearly limits on the number of hours of operation of the combustion turbines, use of water injection and selective catalytic reduction systems to reduce nitrogen oxides, adoption of good combustion practices to minimize emissions of carbon monoxide and volatile organic compounds, and voluntary caps designed to keep emissions of certain airborne contaminants below federal and state thresholds for new source review and prevention of serious deterioration regulatory programs. Such mitigating measures were part and parcel of KeySpan's original proposal and permit applications for the Energy Center, and were thoroughly reviewed by, and discussed with the DEC, an involved agency other than LIPA. As such, those measures were incorporated as part of an open and deliberative process, were properly considered by LIPA in making its determination that the Project would have no significant adverse environmental impacts, and did not render the

resulting negative declaration procedurally defective (*see Matter of Merson v McNally, supra; Matter of Village of Tarrytown v Planning Bd. of Vil. of Sleepy Hollow, supra; Matter of Iroquois Cent. School Dist. v Zagata,* 241 AD2d 945 [1997]).

The petitioners' claim that the DEC failed to conduct an independent SEQRA review before issuing the necessary permits was also properly rejected. Where, as here, the lead agency exercises due diligence in identifying all other involved agencies and provides written notice to them of its determination as to the significance of any environmental impacts, the review procedure comes to an end (*see Matter of Cathedral Church of St. John the Divine v Dormitory Auth. of State of N.Y., supra* at 99), and no involved agency may later require a second determination in connection with the action, such as the completion of a new environmental assessment form, the issuance of a second negative declaration, or the preparation of a full environmental impact statement (*see* 6 NYCRR 617.6 [b] [3] [iii]; *Matter of Gordon v Rush,* 299 AD2d 20, 29 [2002], *affd* 100 NY2d 236 [2003]).

Moreover, the DEC's determinations issuing new air state facility and acid rain permits for the operation of the Energy Center and approving a modification of the Power Station's existing state pollutant discharge elimination system permit to account for additional wastewater effluents from the Energy Center, were neither substantively nor procedurally defective. After receiving KeySpan's completed air and water permit applications for the Energy Center, the DEC caused a notice to be published pursuant to 6 NYCRR 621.6 and received public comments on the applications. In addition, the DEC held a legislative hearing pursuant to 6 NYCRR 621.7. Upon consideration of all the oral and written comments received, the DEC properly concluded, pursuant to the Uniform Procedures Act (*see* ECL art 70), that no significant or substantive issues had been raised that might lead either to the denial of the permits or to the imposition of significant modifications to the Project before the permits would be issued. The petitioners' contentions that the DEC acted improperly in scheduling the legislative hearing on a weekday and in overlapping the hearing relating to the Energy Center with another hearing relating to a different portion of the Project, are without merit and, in any event, fall far short of establishing that the DEC acted arbitrarily or illegally in deciding to issue the permits (*cf. Matter of Silvercup Studios v Power Auth. of State of N.Y.,* 285 AD2d 598, 601 [2001]).

The Supreme Court properly dismissed the petitioners' challenge to the declaratory ruling issued by the Siting Board. Under

Public Service Law § 160 (2), which expired on January 1, 2003, but which was in effect at the time the Energy Center was constructed, a facility with a generating capacity of 80 megawatts or more was designated as a "[m]ajor electric generating facility" and was subject to the requirements of article X of the Public Service Law. Although the two generators at the Energy Center had a combined nameplate capacity of 94 megawatts, the Siting Board determined that the Energy Center did not constitute a major electric generating facility, and therefore was exempt from the requirements of article X of the Public Service Law, because KeySpan made a legally-binding commitment to limit the total electrical output to 79.9 megawatts. The Siting Board's interpretation of the term "generating capacity," which was based on actual operating capacity rather than maximum theoretical output, was both realistic and reasonable (*see Matter of UPROSE v Power Auth. of State of N.Y.*, 285 AD2d 603 [2001]).

The Supreme Court also properly dismissed that branch of the amended combined petition and complaint which sought to annul the condemnation of the 1.5-acre site for the Energy Center since the exclusive remedy for challenging the condemnation is a proceeding in this Court (*see* EDPL 207 [a]).

Finally, we find that, under the circumstances of this case, granting LIPA's request for an award of costs and disbursements was not equitable (*see* CPLR 8101). Therefore, we modify the order and judgment accordingly.

The petitioners' remaining contentions are without merit. Ritter, J.P., Goldstein, Mastro and Fisher, JJ., concur.