Matter of Croton Watershed Clean Water Coalition v Planning Bd. of Town of Southeast (2004 NY Slip Op 50247(U))

BODY {
font-family : "Times New Roman", Times, serif;
font-size : larger;
}

P {
line-height: 150%;
text-indent: 2em
}

[*1]

Matter of Croton Watershed Clean Water Coalition v Planning Bd. of Town of Southeast

2004 NY Slip Op 50247(U)

Decided on April 1, 2004

Supreme Court, Westchester County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on April 1, 2004

Supreme Court, Westchester County
In the Matter of the Application of Croton Watershed Clean Water Coalition, Inc., PUTNAM COUNTY COALITION TO PRESERVE OPEN SPACE, INC., and WILLIAM DELAFIELD, Petitioners,
againstPlanning Board of the Town of Southeast and 360 TURK HILL CORP., Respondents.
Index No. 03-12711

James Bryan Bacon, Esq., Attorneys for Petitioners, 169 Main Street, New Paltz, New York 12561
Hogan & Rossi, Attorneys for Respondent 360 Turk Hill Corp. 1441 Route 22, Suite 204B Brewster, NY 10509
Attn: David Simon, Esq.
Stephens & Charbonneau Attorney for Respondent Planning Board of the Town of Southeast 1441 Route 22, Suite 204A Brewster, NY 10509
Attn: Willis H. Stephens, Esq.


Mary H. Smith, J.
This is a CPLR Article 78 proceeding in which petitioners Croton Watershed Clean Water Coalition, Inc. (the "Clean Water Coalition"), Putnam County Coalition to Preserve Open Space, Inc. (the "Open Space Coalition") and William Delafield (hereinafter collectively referred to as "petitioners") seek a judgment pursuant to CPLR Article 78: (1) annulling, vacating, and voiding the Respondent Planning Board of the Town of Southeast's (the "Planning Board") Conditioned Negative Declaration ("CND"), which was adopted pursuant to a Resolution dated March 24, 2003, as arbitrary, capricious and an abuse of discretion as it was adopted in contravention of the procedural and substantive requirements of the State Environmental Quality Review Act ("SEQRA"); (2) annulling, vacating and voiding the Planning Board's July 14, 2003 grant of preliminary subdivision approval; (3) annulling, vacating and voiding the Planning Board's resolution of February 10, 2003, which granted a waiver of the Town of Southeast's Land Subdivision Regulations Section 123-35(D)(2) without any review pursuant to SEQRA; and (4) directing that the Planning Board issue a determination that the project will have a significant detrimental environmental effect and requiring the preparation of an Environmental Impact Statement ("EIS"). For the reasons set forth more fully herein, the petition is denied in its entirety.
FACTUAL BACKGROUNDThe project at issue, which is known as the Weston Chase Subdivision, involves Respondent, 360 Turk Hill Corp.'s ("Turk Hill") proposed 12-lot subdivision and development of [*2]single-family homes on 68 acres of land in the Town of Southeast, New York (the "property").[FN1] Petitioners describe the property as "contain[ing] at least 20.6 acres of wetlands and 13 acres of steep slopes ... and [being] located northeast of the Rt. 124/Turk Hill Road intersection in the Town of Southeast, New York." (Petition at ¶ 16).[FN2] The prior uses of the property included agricultural and mining for sand and gravel (which operation was abandoned sometime in the 1980's), which left a substantial portion of the area disturbed and one of the wetlands found on the property was "actually a natural depression in the land due to the extensive mining that occurred ...." (See Comments from Turk Hill's engineer, Mr. Tim Allen, at Planning Board Meeting of January 13, 2003, Petition, Exhibit E-3 at 4; see also Conditioned Negative Declaration dated March 24, 2003 which states that "wetlands in the western portion near Turk Hill Road are the remnants of former mining activity on the property", Petition, Exhibit A at 2). In this proceeding, petitioners contest the Planning Board's adoption of the CND [FN3] with regard to Turk Hill's proposed development of the property into a 12-lot subdivision. Petitioners raise a number of environmental concerns as the reasons for why they believe the requisite "hard look" was not taken in connection with the Planning Board's adoption of the CND.
One of the main concerns raised is that there would be a loss of .6 acres of wetlands and 1.2 acres of wetland buffers as a result of this project. Because wetlands and wetland buffers [*3]provide flood prevention capacities, act as natural filters to prevent contamination from storm water runoff, and sometimes provide habitats for endangered or threatened species [FN4], petitioners view this loss of wetlands and wetland buffers to be a significant detrimental environmental impact of the project. Thus, in addition to the concerns of flooding and soil erosion to the neighboring properties, petitioners are also concerned that the project could lead to the contamination of water supply both to the water supplied from wells located near the project as well as to the water supplied to 9 million New York City residents from the Muscoot Reservoir. This is because the June Brook, which bisects the property, flows into the Holly Stream [FN5] which then flows into the east branch of the Croton River, which, in turn, flows into the Muscoot Reservoir. There is also another tributary to the Holly Stream found on the southern side of the property.
The loss to wetlands and wetland buffers arises (for the most part) as a result of the placement of three detention basins one in the wetland that had been created by the mining practices and two in the wetland buffers.[FN6] These detention basins were proposed as storm water prevention devises to offset any potential for flooding and/or soil erosion to the property and adjacent properties as a result of this project. The homes themselves and the landscaping associated with the homes do not invade the wetlands or wetland buffers. And as described more fully infra, other than the detention basins, the only other developments invading the wetland buffers involve a small portion of an 18-foot wide common driveway made of gravel, and 100 feet of storm drainage piping leading to the wet pond in the buffer area.
Petitioners also object to the Planning Board's CND because it permits the development of 12-lots, whereas under the Town of Southeast's zoning laws and Natural Resource Protection Plan, which were adopted subsequent to the Planning Board's adoption of the CND, the maximum number of lots that the property could have been subdivided into would have been 7 lots. In this regard, petitioners contend that the Town of Southeast's planning consultant and engineering consultant both recommended by letters dated February 10, 2003, that Turk Hill submit a new proposal reducing the number of lots from 12 to 7. (See Petition at 23, and Petition Exhibits L-2 and M). Finally, it appears that Mr. Delafield objects to the potential for increased [*4]traffic and claims that the Planning Board's failure to conduct a traffic study rendered its SEQRA determination invalid.[FN7]
This is not the first proceeding alleging a SEQRA violation by the Planning Board in connection with their approval of projects found in the vicinity of this project. (See, e.g., Riverkeeper, Inc. v. The Planning Board of Southeast, 2003 WL 2004173). Furthermore, this region has been the subject of recent environmental scrutiny by other agencies. This scrutiny has resulted in regulations such as:
1.Governor Pataki's Executive Order designating the East of Hudson Croton Watershed wetlands as "Critical Resource Waters" and the U.S. Army Corps of Engineers similar designation of all water areas and wetlands as "Critical Resource Waters."
2.The New York State Department of Environmental Conservation's ("DEC") and Department of Environmental Protection's ("DEP") enactment of phosphorous reduction plans for the Muscoot Reservoir and its TMDL ("Total Maximum Daily Loads") program based on the DEC's identification of the Muscoot Reservoir as not meeting water quality standards established pursuant to the federal Clean Water Act.
(See Petitioner's Memorandum of Law at 17).
Based on the Town of Southeast's recent adoption of a new Comprehensive Plan, Croton Plan, Natural Resource Protection Plan and amendments to its zoning and subdivision laws [FN8], it is clear that the Town is grappling with how to properly reconcile the competing interests at stake (i.e., the development rights of the property owners vs. the environmental protection/open space rights of adjoining property owners and other interested parties). The Town of Southeast's recently adopted laws are designed to preserve open space and provide protection to environmentally sensitive areas such as wetlands and wetland buffers. Indeed, at the time this project was proposed, there was a building moratorium in effect (enacted 2/28/02) for an area which encompassed the property so that the Town of Southeast would have time to assess the desired scope for future development and draft the above-referenced laws. Thus, in or about August 2002, Turk Hill applied to the Town Board for a variance (waiver) of the building [*5]moratorium in connection with its proposed project and provided the Town Board with a sketch plan of the proposed subdivision. It is undisputed that under the then existing Resource Protection Plan and zoning laws, the maximum number of lots into which the property could have been subdivided was 18.
By resolution dated September 12, 2002, the Town Board granted the requested waiver finding, among other things, that the requested variance was "consistent with the spirit of the intended master plan and prospective zoning code amendments being considered, in that it provide[d] a subdivision configuration which maintains the four (4) acre minimum lot size ...." (See Resolution dated 9/12/02, Petition Exhibit C). In addition, the Town Board relied on the Planning Board's recommendation to them that the variance be granted because while the area in question was subject to a zoning change, the proposed project was "still ... in conformance with the zoning requirements [found] in the new Comprehensive Plan ... [and] is consistent with the Comprehensive Plan recommendations for land use and does not conflict in any way with the Recommendations, Goals and Policies of the Comprehensive Plan." (Resolution dated 8/26/02, Affirmation of Donald M. Rossi, Esq. dated November 19, 2003 ("Rossi Affirmation") at Exhibit D).[FN9] It is undisputed that because the project had been granted the moratorium variance, pursuant to the language of the subsequently adopted zoning laws, the project was exempt from the new density factor, which would have reduced the maximum number of lots into which this property could have been subdivided from 12 to 7. (See Town of Southeast Local Law No. 7, Petition, Exhibit S at § 15).
In granting the moratorium variance, the Town Board did not conduct any SEQRA review and the resolution specified that "nothing herein contained shall be deemed or considered to be a determination of environmental significance, nor an approval of the final subdivision configuration, subsurface waste disposal or building envelope location ...." (Petition, Exhibit C).
The moratorium variance permitted Turk Hill to apply for subdivision and site plan approval with the Planning Board in October 2002. The application included a long Environmental Assessment Form dated 10/4/02. (Petition, Exhibit D). At its first meeting concerning the Turk Hill application on 10/28/02, the Planning Board determined that the project was an unlisted action pursuant to SEQRA and that it was proper for the Planning Board to conduct a coordinated review of the application by sending a notice to all involved agencies of its intent to declare itself lead agency (the "Lead Agency Notice"). All notified agencies had to submit any objection they had to the Planning Board's designation as lead agency within 30 days. [*6](See Resolution dated 10/28/02, Petition, Exhibit F). The Planning Board also referred the project to the Southeast Conservation Commission ("SCC") for review based on the flagged wetlands found on the site. (Petition, Exhibit E-1). And in November 2002, Turk Hill submitted its wetlands permit application to the SCC.
Respondents have established that they mailed the Lead Agency Notice (and assorted other papers) to the involved and interested agencies (as those terms are defined in SEQRA's regulations). Thus, the Affidavit of Laurie Fricchione, Planning Board Secretary, sworn to November 14, 2003, establishes that Ms. Fricchione, as part of her established business routine, custom and practice as the Planning Board's secretary, sent by first class mail the Notice of Intent to be Lead Agency, with the Environmental Assessment Form ("EAF"), to, among other agencies, the New York Department of Environmental Conservation (the "DEC"), US Army Corps. of Engineers ("ACOE"), the Southeast Town Board and the Southeast Conservation Commission ("SCC")[FN10] within 4 days after the Planning Board's adoption of the 10/28/02 resolution. The Department of Environmental Conservation was also sent the proposed subdivision plans.
The Planning Board received a response to its Lead Agency Notice from the Department of Environmental Protection ("DEP") dated November 22, 2002. In that letter, the DEP stated that it had no objection to the Planning Board's designation as lead agency, but that it was concerned with the placement of the detention basins in a wetland and in the wetland buffer and required that "[a]lternatives to locating the storm water management practices in the wetland and the wetland buffer must be presented." (Petition, Exhibit G). The letter also requested that alternatives to the layout of the road and driveways be presented to "reduce the amount of disturbance and impervious surfaces to the minimum necessary." (Id.) While the Planning Board did not receive responses from any of the other agencies it notified, petitioners have not created a factual issue with regard to the Lead Agency Notice having been sent as Ms. Fricchione attests. Indeed, petitioners' assertion that the DEC could not "uncover any evidence that the Southeast Planning Board had notified DEC of its intent to assume lead agency status ....", (see Affirmation of James Bacon, Esq. dated August 11, 2003 at ¶ 6) is flatly refuted by statements made by the DEC in a letter it wrote to George Yourke (Secretary of the Concerned Residents of [*7]Southeast) dated August 21, 2003. In that letter, the DEC confirms that on November 4, 2002, it received the Planning Board's resolution dated October 28, 2002 declaring its intent to be lead agency (which also enclosed the EAF dated October 4, 2002). The DEC apparently responded on November 25, 2002 by requesting a project map so that it could determine its position on lead agency, which was transmitted by Turk Hill's counsel and received by the DEC on December 6, 2002. The DEC also received the Planning Board's November 25, 2002 resolution, which declared itself to be lead agency. Turk Hill's counsel, Donald M. Rossi, Esq. has affirmed that at no time did the DEC object to the Planning Board's designation as lead agency nor object to the Planning Board's CND. (See Sur-Reply Affirmation of Donald M. Rossi dated January 13, 2004 at ¶¶ 15-16).
By the time of the Planning Board's next meeting on 11/25/02, the 30-day objection period had expired and since there had been no objection raised by any involved agency, the Planning Board adopted a resolution, which declared itself to be Lead Agency and stated that it "shall determine the significance of the action within twenty calendar (20) days of its establishment as Lead Agency, or within twenty calendar (20) days of its receipt of all information it may reasonably need to make the determination of significance, whichever occurs later." (Certified Return, Exhibit 4).
It appears that Turk Hill responded to at least one of the comments that had been submitted by the DEP regarding the need to reduce the amount of impervious roadway surface since as a result of those comments, the "developer decided to eliminate the boulevard entrance, end the road west of the Brook, and serve Lots 7-10 with one common driveway." (See Letter dated February 4, 2003 from Donald M. Rossi, Esq. to Planning Board's Chairman George Rohrman at 3, Certified Return, Exhibit 3). In addition, in response to the issue raised by the DEP concerning the location of the detention basins, the Planning Board had its engineering consultant review alternative sites for the detention basins that would not invade the wetland or wetland buffers.
On January 13, 2003, the Planning Board held the public hearing on the proposed project, and members of the public were invited to comment and raise any issues of environmental concern. Approximately a dozen residents (some of whom are representatives from the Open Space Coalition), spoke at the 1/13/03 Planning Board meeting, including Petitioner Delafield. These residents voiced their concerns over water usage, sanitary disposal, drainage runoff (including concerns over the potential for water seepage from an adjacent pig farm which could contaminate the water supply), flooding, traffic, the location of the three detention basins (one in the wetland and two in the wetland buffers), the access for emergency vehicles, the potential impacts to the stream running north/south through the property, and the potential impacts to 20.6 acres of wetlands. It is important to note, and as set forth in more detail infra, no one voiced concern over the impact the project could have on any endangered or threatened species during the public hearing. Nor did anyone raise this issue in written submissions to the Planning Board during the SEQRA review period.[FN11]
[*8]Turk Hill's engineer consultant and its attorney responded to the questions raised by advising the residents that: (1) each home would have its own septic and would use
approximately 400-500 gallons of water a day and that the Putnam County Health Department and the NYCDEP were in the process of performing perculation tests; (2) the strict regulations regarding manure collection, storage and removal negated any possibility for seepage into the water supply from the adjoining pig farm; (3) "a preliminary storm water analysis for the whole subdivision had been submitted to the Planning Board and it addresse[d], among other things, control of flow runoff and its effects on erosion and the environment ... [and that] [t]he storm water calculations provided to the Board would account for the DEP approval in terms of storm water quantity and quality"; (4) that the one basin in the wetland "is actually a natural depression in the land due to the extensive mining that occurred and therefore was previously disturbed ... [and] [t]he other two basins are in an appropriate area due to the fact that they are located in low-lying areas and in prime location to catch water, despite the fact that they do infringe in the wetland buffer"; (5) there will be a drainage district established to maintain the 3 basins; and (6) all of the lots would have "neither the well nor septic system within the wetland buffer." At the end of the public comment session, the Planning Board closed the public hearing with regard to its SEQRA review. (Petition, Exhibit E-3).
At the next Planning Board meeting held on February 10, 2003, the one issue of potential negative environmental impact surfaced, which was the Planning Board's concern over the placement of the detention basins. The Planning Board members discussed the possibility of their delaying their determination of significance until after they had heard from the SCC concerning its decision over whether to grant Turk Hill the wetlands permit needed to construct these detention basins. (Petition, Exhibit E-4).[FN12] However, the Planning Board was advised by Turk Hill's attorney that the SCC needed the Planning Board's SEQRA determination before the SCC could proceed with Turk Hill's permit request. (Id.) The minutes also reflect that the [*9]Planning Board Chairman "had concerns regarding the Resource Protection Plan and how this project impacted it. He stated that a project was not required to conform to any future changes in resource protection plan calculations but only to what was in place presently." (Id.) The Board also discussed the contents of a letter they had received from their engineer consultant dated 2/10/03, which provided the following comments to Turk Hill's Drainage Report:

"We have conducted a preliminary review of the submitted Drainage Report. Although we have some questions regarding the flow calculations associated with the outlet structures at the water quality basins, in general we find that the methodology and design concept presented in the report is reasonable and supports the conclusion that the storm water measures will adequately attenuate the peak runoff rates to below pre-development levels.The Drainage Report does not provide supporting calculations to indicate the adequacy of the existing pipe crossing for the proposed common driveway.The project design proposes the location of three storm water basins within the wetlands or wetland buffer areas. Specifically, Detention Basin #1 is located in the existing wetland area adjacent to Turk Hill Road, and Water Quality Basins #2 and #3 are located within the wetland buffer area adjacent to the existing stream on Lots 11 and 10 respectively. You have asked if it is feasible to locate these basins outside of the regulated areas. As now designed, the detention basin is located in an existing wetland area with high groundwater conditions and is therefore proposed as a wet pond. The basin could be relocated to an upgradient area on Lot #1 and could effectively capture the storm water runoff from the developed site but would still be located within the 100-foot wetland buffer. To accomplish this, additional removal of existing trees and additional grading within this buffer area would be required. The basin could not feasibly be relocated to an upland area outside of the wetland buffer and still capture surface runoff from the lower portion of the road because of the existing grade limitations. Water quality basins #2 and #3 are now located to capture surface runoff from the common driveway and developed area of the four rear lots. They could be relocated out of the wetlands buffer but this would likely require additional smaller basins and diversion of surface runoff to accommodate the development of these lots as configured."(See Letter dated 2/10/03 from Thomas Fenton, P.E., Nathan L. Jacobson & Associates, Petition, Exhibit L-2; emphasis added). Thus, in response to the Planning Board request to analyze the benefits of relocating the detention basins to different areas (and in response to the DEP's concerns), the engineering consultant determined that the placement of the detention basins in the wetland and wetland buffers was optimal since they were positioned to capture the most runoff and produced the least disturbance to the property (in terms of tree removal and grading).
During that same meeting, the Planning Board adopted a resolution that granted Turk Hill a waiver to Town Subdivision Law section 123-35(D)(2) regarding a dead-end road of 1,000 feet [*10]long to service the 12 homes rather that the statutory maximum of 10 homes on such a road. The reasons the Planning Board gave for their grant of this waiver included: (1) that the common driveway was safe (wide enough for emergency vehicles); (2) that it would not adversely impact the health and safety of surrounding properties; (3) that the common driveway was further subject to a driveway easement and maintenance agreement; (4) that the extension of the Town Road to serve lots 7-10 would create a hardship to applicant by increasing costs to applicant; and, most importantly (5) that this "waiver will result in less overall site disturbance, less impervious surface and is conducive to a rural atmosphere, all goals of the Comprehensive Plan and Zoning Ordinance as confirmed by findings of both the Planning Board and the Town Board in granting the moratorium variance request for the Project." (See Petition, Exhibit O).[FN13]X
On March 24, 2003, the Planning Board issued a Conditioned Negative Declaration respect to this project. Because of its importance to the case at bar, the Conditioned Negative Declaration is herein reprinted verbatim:

"The Planning Board of the Town of Southeast, after careful consideration of the materials identified below, has determined that the proposed action would not have a significant effect on the environment and that a Draft Environmental Impact Statement will not be prepared. [FN14][*11]Reasons Supporting this Determination:
* * *

WHEREAS, the Planing Board declared itself Lead Agency under SEQRA on 11/25/02; andWHEREAS, the Planning Board held a Public Hearing for the purpose of hearing comment on the application prior to its determination of significance on 1/13/03; andWHEREAS, of the 68 acres on the property, approximately 20.6 acres are within wetlands and 14.4 acres within wetland controlled areas (also known as wetland buffer areas); andWHEREAS, an additional 6.5 acres of the property contain slopes of 15 percent to 25 percent and 3.8 acres of the property contains slopes greater than 25 percent; andWHEREAS, the applicant prepared calculations according to the Resource Protection Plan (§138-21 of the Zoning Code) and the current R-60 zoning indicating that up to 18 dwelling units could be constructed on the property; andWHEREAS, the applicant proposes to subdivide the approximately 68-acre property into twelve (12) lots each of which is greater than four (4) acres in minimum lot size; andWHEREAS, the wetlands on the subject site are in three areas and have different qualities:wetlands in the eastern portion of the property are topographically and hydrologically up-gradient from any proposed development, wetlands along the stream corridor in the center of the property have already been crossed by a roadway (and two 48-inch culverts) within the property, and wetlands in the western portion near Turk Hill Road are the remnants of former mining activity on the property; andWHEREAS, to control storm water runoff generated by development in the proposed subdivision (including road and roof surfaces) a system of water quality basins and detention basins is proposed; andWHEREAS, the Drainage Analysis indicates that post-construction flow volumes and rates will be less than pre-development flow volumes and rates using the proposed storm water best management practices; and[*12]WHEREAS, two water quality basins are located within the wetland controlled area along the stream corridor in the central portion of the property and one detention basin is located within the wetland in the western portion of the property; andWHEREAS, the Town's Consulting Engineer, Tom Fenton, PE, has reviewed the proposed storm water management plan and the Drainage Report prepared by the applicant and found (in his letter dated 2/10/03) that:1)'Water quality basins #2 and #3 are now located to capture surface runoff
from the common driveway and developed area of the four rear lots. They
could be relocated out of the wetlands buffer area but this would likely
require additional smaller basins and diversion of surface runoff to
accommodate the development of these lots as configured', and

2)'The [detention] basin could be relocated to an upgradient area on Lot #1
and could effectively capture the storm water runoff from the developed
site but would still be located within the 100-foot wetland buffer. To
accomplish this, additional removal of existing trees and additional
grading within this buffer area would be required. The basin could not
feasibly be relocated to an upland area outside of the wetland buffer area
and still capture surface runoff from the lower portion of the road because
of the existing grade limitations.'; and

WHEREAS, while the storm water basins are necessary to handle on-site runoff generated by development and will improve handling and treatment of storm water generally, locating the storm water management basins within the wetland buffer or within the wetland would potentially create impacts to the wetlands and wetland controlled areas;NOW THEREFORE BE IT RESOLVED, that the Planning Board determines that the
following conditions will mitigate the impacts identified as a result of the project:
1)to mitigate disturbance to the western wetland from construction of the detention basin, the applicant will provide additional herbaceous and woody wetland plantings (beyond any plantings required as per the New York State Storm water Design Manual for a wet pond) in the vicinity of the area disturbed by creation of the detention basin and its outfall to provide species diversity and enhanced wildlife habitat; and
2)to further protect the wetland from future disturbance the applicant will create, and will file all necessary legal documentation with the Town of Southeast and Putnam County, a 50-foot wide conservation easement measured from the eastern edge of the delineated wetland within which no improvements can be made [*13](subject to approval of the proposed storm water pollution prevention plan and final subdivision approval) and within which existing vegetation would be allowed to remain and continue to grow in a natural condition and within which no herbicides, pesticides, fertilizers, or other common lawn and garden chemicals will be applied."
This Conditioned Negative Declaration ("CND") was then transmitted to all involved and interested agencies and they were allowed 30 days within which to provide any comments. It appears that the Planning Board received comments from various entities, but not from agencies that would be determining whether to provide the necessary permits/approvals in connection with this project (e.g., the DEP for the Storm Water Pollution Prevention Plan). The comments received (as well as the pre-CND comment correspondence) are annexed as exhibits to the petition. (See Riverkeeper correspondence dated January 24, 2003, March 1, 2003, April 24, 2003 and April 28, 2003, Exhibits H-1-H-4; Croton Watershed Clean Water Coalition correspondence dated February 25, 2003 and April 27, 2003, Exhibits I-1 and I-2; Correspondence from the Open Space Coalition dated February 28, 2003 and April 27, 2003, Exhibits J-1 and J-2; Correspondence from Southeast Concerned Residents dated January 20, 2003, February 12, 2003, February 17, 2003, March 3, 2003, March 17, 2003, June 1, 2003, July 10, 2003, and July 14, 2003, Exhibits K-1-K-10).
After the expiration of the thirty-day comment period and the approval from the SCC of Turk Hill's wetlands permit application, the Planning Board adopted a resolution dated July 14, 2003 granting preliminary subdivision approval to the project. (Certified Return, Exhibit 4). The preliminary subdivision approval added conditions in addition to those found in the CND, such as the establishment of a Drainage District thereby making the homeowners financially responsible for maintaining the detention basins. Furthermore, the approval was expressly conditioned on the applicant's obtaining all necessary permits/approvals from other state and federal agencies.
As set forth in more detail, infra, petitioners assert that the Planning Board's CND violated SEQRA's procedural and substantive requirements. They also seek to annul the Planning Board's preliminary subdivision approval, and the Planning Board's waiver of the law regarding the maximum number of houses that may be served on a 1000 foot dead end street. Respondents have submitted Verified Answers, which deny that there was any violation of SEQRA's procedural or substantive requirements. Indeed, the Planning Board avers that:

"[The] applicant's professional engineer demonstrated that the project would actually enhance wetland function, reduce storm water and erosion impacts and provide no negative impact to groundwater."(Planning Board Answer at ¶ 33). In addition, respondents have asserted multiple affirmative defenses, including their claim that petitioner lacks standing to bring this proceeding. Since standing is an essential ingredient to the viability of this proceeding, the Court will address the merits of this defense first.

LEGAL DISCUSSIONPETITIONERS' STANDING
To establish standing, the petition provides the following interests-at-stake for each petitioner. The Clean Water Coalition is described as a "not-for-profit corporation constituting an alliance of organizations and individuals dedicated to maintaining, protecting, and improving the quality of the waters in the New York City Croton Watershed" and the organization includes "individuals who use and drink New York City water from the Croton Watershed." (Petition at ¶ 3). It is alleged that the members of the Clean Water Coalition are directly affected by projects such as the one involved in this proceeding "that destroy wetlands and forests, pave meadows and discharge storm water into the New York City drinking water supply, including as here, the June Brook, a tributary of Holly Stream which feeds the East Branch Croton River." (Petition at ¶ 4).
The Open Space Coalition is described as a "not-for-profit organization composed of residents of the towns of Putnam County, including the Town of Southeast, united to ensure the protection in perpetuity of environmentally sensitive, ecologically endangered, and historically, educationally, and culturally significant lands and structures." (Petition at ¶ 5). The members are allegedly impacted by the "consequences of residential developments surrounding the Muscoot Reservoir and Croton Watershed." (Petition at ¶ 6).
Finally, Mr. Delafield is described as a member of the Open Space Coalition and a resident of Southeast "whose property includes a section of June Brook downstream from the project site which is subject to significant flooding." (Petition at ¶ 7). Indeed, Mr. Delafield's property is located directly across the street from the proposed subdivision. Mr. Delafield's concerns relating to this project "include the project's potential to exacerbate flood damage to his property, contaminate his drinking water supply, displace or destroy on-site threatened species and potentially, the endangered species Bog Turtle and/or its habitat ...." (Petition at ¶ 8). Finally, while not asserted in the petition, petitioners Mr. Delafield and the Clean Water Coalition assert in their Reply Affidavits that Mr. Delafield is also a member of the Clean Water Coalition.
Both respondents have asserted as an affirmative defense that "Petitioner lacks standing to assert the claims set forth in the Verified Petition." (Turk Hill Answer at ¶¶ 154-156; Planning Board Answer at ¶¶ 154-156). Respondents' Answers, however, do not specify whether they are challenging the standing of one or all three of the petitioners. While Respondent Turk Hill's Memorandum of Law singles out the Clean Water Coalition as the petitioner whose standing it is contesting, it is still unclear whether respondents are challenging the standing of all of the petitioners. The Court will therefore address whether standing has been established with respect to each of the three petitioners.
It is well settled that "[t]o establish standing [under SEQRA], the petitioners must show (1) that they will suffer an environmental 'injury that is in some way different from that of the public at large,' and (2) that the alleged injury falls within the zone of interest sought to be protected or promoted by the statute under which the governmental action was taken." (Matter of Blue Lawn, Inc. v. County of Westchester, 293 AD2d 532, 533, app. denied, 98 NY2d 607; citing The Society of Plastics Indus., Inc. v. County of Suffolk, 77 NY2d 761, 772-772; Long Island [*14]Pine Barrens Society, Inc. v. Town of Islip, 261 AD2d 474; Long Island Pine Barrens Society, Inc. v. Planning Bd. of the Town of Brookhaven, 213 AD2d 484, 485). Thus, for proceedings asserting SEQRA violations, a party must demonstrate that it will suffer an injury that is environmental and not solely economic in nature. (See Matter of Mobil Oil Corp. v. Syracuse Indus. Dev. Agency, 76 NY2d 428; Matter of Bridon Realty Co. v. Town Bd. of the Town of Clarkstown, 250 AD2d 677, app. denied, 92 NY2d 813; Matter of Empire State Rest. & Tavern Ass'n v. Rapoport, 240 AD2d 576, 577; Matter of Fox v. Favre, 218 AD2d 655).
This case, involving organizations formed to protect the exact area in which the proposed project is located is similar to other decisions involving the standing of entities that had been formed to protect the Pine Barrens of Long Island. For example, in Matter of Long Island Pine Barrens Society, Inc. v. Central Pine Barrens Joint Planning and Policy Commission, NYLJ, November 21, 1996, p.32, col. 4, an Article 78 was brought concerning the validity under SEQRA of a resolution approving the construction of athletic facilities on 30 acres of underdeveloped Pine Barrens in the Town of Brookhaven. The Pine Barrens, like the Croton Watershed, had been the subject of state legislation designed to "preserve the hydrologic and ecologic integrity of the Central Pine Barrens area for future generations." Petitioners were (1) the Long Island Pines Barren Society, a not-for-profit formed to act as a watchdog for the Pine Barrens; (2) Petitioner Richard Amper, Jr., a member of the Long Island Pine Barrens Society and a resident of the Town of Brookhaven; (3) Petitioner Deiree Passantino, a resident of Riverhead who was "'concerned about the effects that the ... proposal will have on the quality of groundwater and the preservation of open space and local wildlife in the Central Pine Barrens'"; (4) Petitioner Joseph Colao, a resident of Southhampton who raised concerns of the project's impact on the environment; (5) Petitioner, the North Fork Environmental Counsel, also a not-for-profit with a purpose "to protect the use and enjoyment of Long Island's open spaces"; (6) Petitioner ACT Now, a not-for-profit with a purpose to preserve the quality of life on eastern Long Island; and (7) the Long Island Group of the Sierra Club, a not-for-profit organization devoted to environmental protection and preservation. The court found that all groups had membership in the area in close proximity to the Fireman's Park and to the Central Pine Barrens and that their drinking water emanated from the Hydrologic Zone III, which is part of the Pine Barrens. The individual petitioners also asserted that they used the parks for hiking and bird watching and that the proposed athletic facility would detrimentally impact their enjoyment of the parks.
Addressing the issue of standing, the court found that the injury asserted by all petitioners was "within the zone of interest sought to be protected by both the [state legislation designed to protect the Pine Barrens] and SEQR." However, the Court found only two petitioners satisfied the standing requirements, Mr. Amper and the Long Island Pine Barrens Society. Initially, the court discounted some indicia of standing i.e., because Mr. Amper's home was .75 of a mile away from the project, Mr. Amper could not benefit from the presumption of injury from being in close proximity to the project. Furthermore, Mr. Amper's claims concerning the detrimental impact to his enjoyment of the park and the impact on vegetation were no different from the injury to the public at large, and therefore could not provide a basis for standing. However, the Court found Mr. Amper had standing because of his allegation that he "receive[d] his drinking water from a Suffolk County Water Authority well located between his home and the proposed [*15]site. The groundwater flows from the proposed athletic field toward the well site ... the introduction of fertilizers, pesticides, increased human waste and oils from spraying and vehicle use and parking associated with the athletic activities will compromise his personal source of drinking water, which is different from 99% of the population." (Long Island Pine Barrens, NYLJ, November 21, 1996, p.32, col 4).
Likewise, in the case cited by petitioners in support of their standing argument (Matter of Long Island Pine Barrens Society, inc. v. Town of Islip, 261 AD2d 474), the Appellate Division, Second Department found standing in an action which sought to annul the Town of Islip's sale of an 88-acre parcel of property located in the Pine Barrens. In that case, petitioners had alleged that they had experienced a problem of rust in their drinking water and that the Suffolk County Water Authority had performed tests on the 88-acre site to determine if wells on that property could serve as a replacement water source. Based on these allegations, the Court found that petitioners had made more than "generalized allegations that the sale will have a 'deleterious impact' on their water supply." (Matter of Long Island Pine Barrens Society v. Town of Islip, 261 AD2d 474, 475).
Based on these as well as other decisions, the Court finds that Petitioner Delafield has established standing since he is an owner of property in close proximity (across the street) to the challenged project and he has asserted that he will suffer an "injury in fact, distinct from that of the general public" based on his allegations that the project has the potential to exacerbate flooding to his property and contaminate his drinking water supplied from a well. (See also Matter of Many v. Village of Sharon Springs Bd. of Trustees, 218 AD2d 845; Chase v. Board of Education of the Roxbury Central School District, 188 AD2d 192; In re Application of Committee to Preserve Brighton Beach and Manhattan Beach, Inc. v. The Planning Commission of the City of New York, 259 AD2d 26, 31; quoting The Society of the Plastics Industry, Inc. v. County of Suffolk, 77 NY2d 761). Indeed, not only is the project in close proximity to Mr. Delafield's property, but in addition, the property and Mr. Delafield's property share a common waterway since Mr. Delafield's property includes a section of June Brook located downstream from the project. The proximity of Mr. Delafield's property to the project "permits an inference of injury enabling a nearby party to challenge an administrative determination without proof of actual injury." (Matter of Gernatt Asphalt Prods., Inc. v. Town of Sardina, 87 NY2d 668, 687; Matter of Sun-Brite Car Wash, Inc. v. Board of Zoning & Appeals of the Town of North Hempstead, 69 NY2d 406, 414; Matter of McGrath v. Town Bd. of The Town of North Greenbush, 254 AD2d 614, app. denied, 93 NY2d 803; Matter of Parisella v. Town of Fishkill, 209 AD2d 850). Courts routinely hold that petitioners who live adjacent to or directly across from the objectionable project "presumptively demonstrate ... that they have sustained damage different from the public at large ...." (See, e.g., Matter of O'Donnell v. Town of Shoharie, 291 AD2d 739, 740-741).
With regard to the organizational petitioners (the Open Space Coalition and the Clean Water Coaliton), there are three additional requirements that must be met before standing may be found: (1) whether one or more members have standing to sue; (2) that the interests asserted by the organization are germane to its purposes such that it is the appropriate representative of those interests; and (3) "that neither the asserted claim nor the appropriate relief requires participation of the individual members." (The Society of Plastics Industry, Inc. v. County of Suffolk, 77 [*16]NY2d 761, 786).
Based on the 3-part test, it would appear that the Open Space Coalition has standing to bring this action since Mr. Delafield is a member of that organization, who has established standing in his own right and therefore, his "standing is attributable to ... that organization." (Matter of Coalition for Future of Stony Brook Village v. Reilly, 299 AD2d 481). Here the Open Space Coalition has asserted as its interest "the protection in perpetuity of properties" that are, among other things, environmentally sensitive or ecologically endangered. Accordingly, it is alleged that its members are impacted by the consequences of residential developments surrounding the Muscoot Reservoir and Croton Watershed. Thus, Mr. Delafield and the Open Space Coalition share the interest of protecting wetlands given the important functions they provide.
The Open Space Coalition's standing is also confirmed by the Appellate Division, Second Department's decision in Matter of Coalition for Future of Stony Brook Village, supra. In that case, as here, the Coalition for the Future of Stony Brook Village was specifically formed to save an area known as the Forsythe Meadows. In July 2000, Suffolk County purchased 36 of the 43 acres of the Forsythe Meadows for conservation purposes. But the owner of the remaining property submitted an application in August 2000 to expand the Stony Brook Post Office and to construct an Educational and Cultural Center in the Forsythe Meadows. In that case, the Court found that two members of the coalition had standing to bring the proceeding and since they were members of the Petitioner Coalition, their standing was attributable to the Coalition. In addition, the Court held that "interests asserted by the Coalition are germane to its purposes, and neither the asserted claim nor the appropriate relief requires participation of the individual members." (Matter of Coalition for Future of Stony Brook Village v. Reilly, 299 AD2d at 484; see also Matter of Penfield Panorama Area Community, Inc. v. Town of Penfield Planning Bd., 253 AD2d 342, 345).
By contrast, the Clean Water Coalition has not established standing. As explained by the Appellate Division, Third Department in Matter of Otsego 2000, Inc v. Planning Bd. of the Town of Otsego, 171 AD2d 258, standing by an organization dedicated to the preservation of natural resources must be established by "in-fact injury within the zone of interest of environmental statutes ... by proof that agency action will directly harm association members in their use and enjoyment of the affected natural resources." (Matter of Otesgo, 171 AD2d at 260). In that case, standing was not established because the petitioner's allegations were only "generalized claims of harm no different in kind or degree from the public at large, which are insufficient for standing purposes." (Id.). Here, while Mr. Delafield has standing and is alleged to be a member of that group, his standing cannot be attributed to the Clean Water Coalition for a couple of reasons. First, Mr. Delafield's potential environmental injuries concerning flooding to his property and contamination of his well water are not the same environmental injuries asserted by the Clean Water Coalition, whose sole purpose is to maintain, protect, and improve the quality of the waters in the New York City Croton Watershed. Second, the Clean Water Coalition's claim of potential harm to the Muscoot Reservoir drinking supply is a generalized claim of harm which is no different in kind or degree from the public at large, and therefore, is insufficient to confer standing. Thus, even if Mr. Delafield could be found to fairly represent the Clean Water Coalition's interests in this proceeding, the environmental harm alleged is insufficient because it [*17]is not an injury that is in some way different from that of the public at large. While standing has been afforded parties who have shown that the proposed action might affect the parties' water supplied by a well that could be impacted by storm water drainage (see Matter of Many v. Village of Sharon Springs Board of Trustees, 218 AD2d 845; Chase v. Board of Education of the Roxbury School District, 188 AD2d 192), courts have denied standing where the injury alleged involves water supplied to the public at large. (See, e.g., Schulz v. Warren County Bd. Of Supervisors, 206 AD2d 672; Otsego 2000, Inc. v. Planning Bd. Of the Town of Ostego, 171 AD2d 259). Accordingly, the Clean Water Coalition has failed to establish standing for the purposes of this proceeding.
THE PLANNING BOARD FULFILLED ITS LEAD AGENCY OBLIGATIONS UNDER SEQRA
The intent behind SEQRA's enactment is to ensure that agencies "conduct their affairs with an awareness that they are stewards of the air, water, land, and living resources, and that they have an obligation to protect the environment for the use and enjoyment of this and all future generations." (ECL § 8-0103[8]). Thus, SEQRA's purpose is to "promote efforts which will prevent or eliminate damage to the environment and enhance human and community resources ...." (ECL § 8-0101). New York's Court of Appeals has recently explained that to further SEQRA's purpose

"the Legislature created 'an elaborate procedural framework' governing the evaluation of the environmental ramifications of a project or action .... In assessing the significance of a proposed action under SEQRA, the lead agency must 'thoroughly analyze the identified relevant areas of environmental concern to determine if the action may have a significant adverse impact on the environment; and set forth its determination of significance in a written form containing a reasoned elaboration and providing reference to any supporting documentation' (6 NYCRR 617.7[b][3], [4]). Where the lead agency concludes either that 'there will be no adverse environmental impacts from the action or that the identified adverse impacts will not be significant,' the agency may issue a negative declaration thus obviating the EIS [Environmental Impact Statement] requirement (6 NYCRR 617.7[a][2])."(Matter of New York City Coalition to End Lead Poisoning, Inc. v. Vallone, 2003 WL 21498390 at 4). In this proceeding, petitioners claim that the Planning Board violated both the procedural and substantive requirements of SEQRA through its adoption of the CND, its waiver of the law regarding number of homes to be served by a 1000 foot dead end road, and its decision to grant preliminary subdivision approval. As discussed below, the Court finds petitioners' alleged SEQRA violations to be without merit.
THE PLANNING BOARD FOLLOWED SEQRA'S PROCEDURAL REQUIREMENTS
Petitioners assert the following four procedural violations committed by the Planning Board in connection with the adoption of the CND: (1) the Planning Board failed to circulate its [*18]Notice of Intent to be Lead Agency to all involved agencies (Petition at ¶¶ 132-133, 147); (2) the Planning Board failed to fill out Part 2 of the EAF and instead relied on the answers provided by Turk Hill's engineer (Petition at ¶¶ 70-71) and the EAF was also deficient because it included numerous omissions and incorrect answers (Petition at ¶¶ 62-125); (3) the Town Board's moratorium variance should have triggered SEQRA because it was a "significant step in the project's approval process" (Petitioners' Memorandum of Law at 7); and (4) the Planning Board improperly delegated its substantive SEQRA review responsibilities to agencies that are subject to providing their own separate approvals with regard to permits required for this project (e.g., the Department of Environmental Conservation, the Department of Environmental Protection, the US Army Corps of Engineers, and the Southeast Conservation Commission) (Petition at ¶¶ 127, 143-144, 147). However, the Court finds that the Planning Board fulfilled the procedural requirements delineated in SEQRA's regulations.
A.The Planning Board Sent Its Lead Agency Notice
It is petitioners' contention that the Planning Board failed to follow SEQRA's procedural requirements by mailing its Lead Agency Notice to the following involved agencies (1) the Department of Environmental Conservation ("DEC"), (2) the US Army Corps. of Engineers ("ACOE"), (3) the Putnam County Department of Health, (4) the Southeast Town Board, and (5) the Southeast Conservation Commission ("SCC"). (See Petition at ¶¶ 132-134). It is unclear whether all of these agencies are all involved agencies as that term is defined in SEQRA's regulations. Nevertheless, for the purposes of this decision, the Court will assume that these agencies are in fact involved agencies, thereby necessitating that the Planning Board send them its Lead Agency Notice.
As set forth in the above factual recitation, the Planning Board has submitted sufficient proof that its Secretary mailed the Lead Agency Notice to the involved/interested agencies at issue.[FN15] The DEP responded and stated that it had no objection to the lead agency designation and the DEC responded by requesting a map so that it could better determine its involvement in the project in response to the Lead Agency Notice. The map was sent to the DEC and respondents were never advised by the DEC that it objected to the Planning Board's lead agency designation. SEQRA's regulations provide a remedy to an involved agency who wishes to contest a SEQRA determination (lead agency status) on the ground that it did not receive the notice of intent to be lead agency. (See 6 NYCRR § 617.6(b)(6)). However, an agency may not sit silent and then attempt to have the SEQRA process start anew. (See In Re Gordon v. Rush, 299 AD2d 20, 30, aff'd, 100 NY2d 236). This is because SEQRA's regulations provide "[i]f a lead agency exercises due diligence in identifying all other involved agencies and provides [*19]written notice of its determination of significance to the involved agencies, then no involved agency may later require the preparation of an EAF, a negative declaration or an EIS in connection with the action." (6 NYCRR § 617.6).
Because petitioners have not submitted any evidence suggesting that the Planning Board did not mail the Lead Agency Notice to the agencies listed in the exhibit attached to the Fricchione Affidavit, which includes the agencies identified by petitioners, there is no basis for this Court's finding that the Planning Board failed to comply with the requirement that it mail its Lead Agency Notice to all involved agencies.
B.Planning Board's Failure to Complete Part 2 of EAF
Does Not Render SEQRA Analysis Invalid
Petitioners argue that the Planning Board simply accepted the EAF, which had been drafted by the applicant's engineer, and thereby failed to fulfill its SEQRA duty, which petitioners contend requires that "'[t]he lead agency ... [be] responsible for preparing Part 2 and as needed Part 3." (Petitioners' Reply Memorandum of Law at 4; citing 6 NYCRR § 617.6(a)(2) and Phelps v. Town Board of the Town of Alabama, 174 Misc2d 889).[FN16] By contrast, respondents argue that "the applicable regulations under SEQRA do not mandate that the lead agency itself must prepare the Environmental Assessment Form." (Affirmation of Donald M. Rossi, Esq. dated November 19, 2003"Rossi Affirmation" at ¶ 41).
Petitioners point to numerous omissions in the EAF as evidence that the Planning Board played no role in the drafting of the EAF (i.e., the EAF's failure to (1) identify the name of the lead agency, (2) provide the name and title of the responsible officer in the lead agency and that person's signature, (3) indicate that a Conditioned Negative Declaration will be prepared, and (4) include the date the lead agency reviewed and accepted the EAF). In addition, the Petitioners claim the EAF is deficient insofar as the Planning Board failed to complete EAF queries regarding the existence of (1) any threatened or endangered species, (2) any streams within or contiguous to the project area, and (3) the name of the stream and name of the river to which it is a tributary.
Even if the Court accepts petitioners' assertions with regard to the Planning Board's failure to properly fill out the entire EAF, the Court finds that the Planning Board fulfilled its procedural duty to provide a determination of significance in a written form containing a reasoned elaboration and providing reference to any supporting documentation. (6 NYCRR 617.7[b][3], [4]). The cases cited by petitioners simply support the proposition that an improperly drafted EAF (or an EAF drafted by a third party that is not then reviewed by the agency) may support the nullification of a determination of significance since it is evidence that the agency failed to fulfill its SEQRA review obligations. Furthermore, while the regulations cited suggest that the agency should compete the responses to the questions set forth in the EAF's Parts 2 and 3, they do not support the proposition that an agency's failure to do so renders the [*20]SEQRA determination null and void. Indeed, another regulation suggests that the critical component in an agency's determination of significance is that the agency review the EAF and the criteria for significance set forth in 6 NYCRR 617.7(c) and then "analyze the identified relevant areas of environmental concern to determine if the action may have a significant adverse impact on the environment." (6 NYCRR 617.7(b)(3)). The regulations make clear that the lead agency must provide a determination of significance in a written form containing a reasoned elaboration and providing reference to any supporting documentation. (6 NYCRR 617.7[b][3], [4]). Here, the Planning Board's resolution adopting its CND did just that and further remedied the deficiencies the petitioners have identified in the EAF.
Somewhat disingenuously, petitioners argue that even if it was acceptable for the applicant not to have completed Part 2 of the EAF, the Planning Board still violated SEQRA's procedural requirements because it "took no action to 'independently assess the conclusions set forth by [Turk Hill] in part 2 of the EAF as to the designation of potential environmental impact, its extent, and the possibility of the impact being mitigated.'" (Petitioners' Reply Memorandum of Law at 4; citations omitted). This, of course, goes to whether the Planning Board satisfied its substantive SEQRA review obligation (i.e., that it identified the relevant areas of environmental concern, took a hard look at them, and made a reasoned elaboration of the basis for its determination of no significance detrimental environmental impacts). As discussed more fully herein, the Court finds that the Planning Board more than satisfied the "hard look" requirement with regard to this project.
C.Petitioners' Challenge to the Moratorium Variance and the Waiver of the Subdivision Regulations Regarding the Dead End Road are Without Merit
Petitioners assert that the "Town Board's action approving the Moratorium Variance should have triggered SEQRA as the action was the first step in the process of the project's authorization." (Petition at ¶ 22). Petitioners' claims concerning the moratorium waiver, however, must fail for a number of reasons. First, respondents' affirmative defense that the claim is barred by the four month statute of limitations is accurate. (Turk Hill Answer at ¶ 149; Planning Board Answer at ¶ 149). Thus, to the extent this would be a valid argument, petitioners' claims with regard to the moratorium waiver, which occurred on September 12, 2002, are time-barred since this proceeding was initiated one year later. (Matter of Young v. Board of Trustees of the Village of Blasdell, 89 NY2d 846). Second, respondents are also correct in their affirmative defense that the action of the moratorium variance is not subject to SEQRA review since it is an exempt Type II action. (Turk Hill Answer at ¶ 151; Planning Board Answer at ¶ 151; see also 6 NYCRR § 617.5(c)(30)). Finally, respondents are also correct that this claim would have to be dismissed "for failure to join a necessary and indispensable party" i.e., the Town Board. (Planning Board's Answer at ¶ 150; Turk Hill's Answer at ¶ 150).
Similarly, the decision by the Planning Board to waive the requirement that all dead end roads of 1000 feet serve 10 rather than 12 houses prior to its adoption of the CND is similarly not an action subject to SEQRA review pursuant to 6 NYCRR § 617.2(b)(2) — i.e., it was not a final step committing the Planning Board to a course of conduct with regard to approving this [*21]subdivision. Moreover, even if it could be deemed an action, it clearly falls within the exempted Type II actions since it involved the Planning Board's "engaging in review of any part of an application to determine compliance with technical requirements, provided that no such determination entitles or permits the project sponsor to commence the action unless and until all requirements of this part have been fulfilled." (6 NYCRR § 617.5(c) (28)). Finally, because the waiver occurred on February 10, 2003, any alleged SEQRA violation arising out of this waiver is similarly time-barred by the four month statute of limitations.
D.Planning Board Did Not Improperly Delegate Its SEQRA Responsibilities
It is well settled that a lead agency may not delegate its responsibilities to any other agency. (Matter of Coca-Cola Bottling Co. v. Board of Estimate of the City of New York, 72 NY2d 674). And while a lead agency may rely on third parties for advice in performing its duties under SEQRA, "it must exercise its critical judgment on all of the issues presented in the DEIS." (Matter of Penfield Panorama Area Community, Inc. v. Town of Penfield Planning Board, 253 AD2d 342, 350). With regard to the Planning Board's improper delegation, petitioners give the following example:

"Rather than acknowledging DEP's objections to placing storm water detention ponds in wetlands and wetland buffers, the Board approved the very such plan. Proper coordination of SEQRA would have resulted in the Board requiring the Applicant to revise its plans. Instead, the Applicant will undoubtedly be forced by DEP to redesign its storm water management system as part of DEP's Storm water Pollution Prevention Plan permit review."(Petitioners' Memorandum of Law at 9). Petitioners also argue that the Planning Board should have considered the project's compliance with not only the proposed local laws concerning zoning and the Natural Resource Protection Plan, but also with all federal laws relating to the federal permits that were implicated by the project. (Petitioners' Memorandum of Law at 10; citing Environmental Impact Review in New York, Gerrard, Ruzow and Weinberg, § 805 citing Town of Henrietta v. Department of Environmental Conservation, 76 AD2d 215). In this regard, petitioners argue that the Planning Board utterly failed to identify or apply the federal avoidance criteria set forth in 40 CFR 230.10 (requiring that applicant avoid disturbance of wetland areas prior to considering secondary mitigation measures). (See Petitioners' Memorandum of Law at 9-10).[FN17]
Contrary to petitioners' assertions, the Court has found no authority to suggest that a lead agency must resolve all permitting issues before a determination of significance may be rendered. Here, Turk Hill correctly points out that it was the DEP that had the ultimate responsibility for determining if the proposed storm water pollution prevention plan complied with the requirements of the "Rules and Regulations for the Protection from Contamination, Degradation [*22]and Pollution of New York City Water Supply and its Sources ... [which] insure[s] compliance with the phosphorous offset program requirements, total daily maximum load requirements and the 'no increase in post-development volumes or rates of flow' standard." (Rossi Affirmation at ¶ 49). Furthermore, while the Planning Board relied on the expertise of its planning and engineering consultants, it is quite obvious that the Planning Board undertook its own analysis of the potential negative environmental impacts that could arise from the project.
A classic example of improper delegation occurred in the case of Matter of Penfield Panorama Area Community, Inc. v. Town of Penfield Planning Board, 253 AD2d 342. In that case, a proposed cluster subdivision had been approved on the condition that the owner "'perform specific site characterization that will result in an acceptable remedial action plan' for the cleanup of hazardous waste" on the site and that the owner obtain approval of its remedial action plan from the County Health Department and the DEC. (Matter of Penfield, 253 AD2d at 344). Noting that a lead agency under SEQRA may not delegate its responsibilities to another agency, the Court found that "deferring resolution of the remediation was improper because it shields the remediation plan from public scrutiny ...." and, therefore, "by deferring resolution of the hazardous waste remediation issue, the Planning Board failed to take the requisite hard look at an area of environmental concern." (Matter of Penfield, 253 AD2d at 349-350).
Here, unlike Penfield, the Planning Board did not abandon its duty to identify relevant areas of environmental concern and take a hard look at those areas to assess whether there would be a potential for one or more significant adverse environmental impacts. As set forth in more detail infra, the Planning Board complied with its responsibility to take a hard look at all potential environmental impacts.
THE PLANNING BOARD FULFILLED SEQRA's SUBSTANTIVE REQUIREMENTS
With regard to respondents' alleged violations of SEQRA's substantive requirements, petitioners argue that the Planning Board issued a negative declaration without "identify[ing] and consider[ing] the project's 1) wetlands and storm water impacts, 2) flooding impacts, 3) on-site watercourses, 4) impacts to threatened or endangered species or species of special concern, and 5) material conflict with the Town's planning goals." (Petitioners' Memorandum of Law at 12).
The standard to be applied to an agency's SEQRA determination has been stated as follows:

"It is well settled that judicial review of the SEQRA process is limited to whether "'a determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion' * * * [I]t is not the role of the courts to weigh the desirability of any action or choose among alternatives, but to assure that the agency itself has satisfied SEQRA, procedurally and substantively" ... '[n]othing in the law requires an agency to reach a particular result on any issue, or permits the courts to second-guess the agency's choice, which can be annulled only if arbitrary, capricious or unsupported by substantial evidence.'"(Matter of City of Rye v. Korff, 249 AD2d 470, 471-472, app. denied, 92 NY2d 808; quoting Matter of Jackson v. New York State Urban Dev. Corp., 67 NY2d 400, 416-417). Thus, the issue for this Court is determine whether the agency "identified the relevant areas of [*23]environmental concern, took a 'hard look' at them, and made a 'reasoned elaboration' of the basis for its determination." (Matter of Jackson, 67 NY2d at 416). "Where an agency fails to take the requisite hard look and make a 'reasoned elaboration', or its determination is affected by an error of law, or its decision was not rational, or is arbitrary and capricious or not supported by substantial evidence [FN18], the agency's determination may be annulled." (Matter of WEOK Broadcasting Corp. v. Planning Bd. of the Town of Lloyd, 79 NY2d 373, 383). A negative declaration, which obviates the need for a detailed EIS, will be valid only if it provides "an adequate basis upon which a reviewing court can ascertain [the lack of any significant environmental effect]." (Vallone, supra, 2003 WL 21498390). Furthermore, an agency cannot base its determinations of significance on "no more than generalized, speculative comments and opinions of local residents and other agencies." (Matter of WEOK Broadcasting Corp., 79 NY2d at 384-385).
Courts should refrain from substituting their view for the administrative agency's judgment when it rendered the determination which is being reviewed. (Matter of Jackson v. New York State Urban Dev. Corp, 67 NY2d 400; Matter of Citizens Accord, Inc. v. Town Board of the Town of Rochester, 192 AD2d 985, 987, app. denied, 82 NY2d 656; Matter of Merson v. McNally, 90 NY2d 742, 752).
Here, the Planning Board determined the project to be an unlisted action. Petitioners do not contest the initial designation as an unlisted action, but rather contest the Planning Board's failure, after reviewing the potential environmental impacts, to issue a positive declaration (and require the drafting of an Environmental Impact Statement) given the project's significant adverse environmental impacts.
SEQRA's regulations provide that an agency may not approve an unlisted action until either a negative declaration is issued or a draft EIS is accepted. (6 NYCRR 617.3[c]). In determining whether a negative declaration may be issued or that an EIS must be drafted, the lead agency (the Planning Board) must determine the significance of the unlisted action by undertaking the following steps
"(1) consider the action as defined in sections 617.2(b) and 617.3(g) of this Part;

(2) review the EAF [Environmental Assessment Form], the criteria contained in subdivision (c) of this section and any other supporting information to identify the relevant areas of environmental concern; (3) thoroughly analyze the identified relevant areas of environmental concern to determine if the action may have a significant adverse impact on the environment; and (4) set forth its determination of significance in a written form containing a reasoned elaboration and providing reference to any support documentation."[*24](6 NYCRR § 617.7(b)(1)-(4)). Thus, in making determinations of significance, reviewing agencies must look at impacts which may be reasonably expected to result from the proposed action and compare them against an illustrative list of criteria provided in 6 NYCRR § 617.7(c).
Planning Board Did Not Fail to Address Water-Related Impacts
The Court's review of the Planning Board's SEQRA decision is limited to the record made before the Planning Board. (See Montalbano v. Silva, 204 AD2d 457; Matter of Kelly v. Safir, 96 NY2d 32). Petitioners contend that "the project's disturbance of 20-acres of wetlands, stream banks, wetland buffers, forests and meadows and alteration of the hydrology of the project site with the creation of impervious surfaces and increased storm water runoff, presents an 'adverse substantial change' to both water quality and quantity which should have triggered a positive declaration and EIS." (Reply Memorandum at 8).
Based on a review of the comments received by the Planning Board from the various entities both prior to and during the CND comment period, the Court finds that none of the comments received can be categorized as anything other than "generalized, speculative comments and opinions of local residents and other agencies." (Matter of WEOK Broadcasting Corp., 79 NY2d at 384-385). Thus, no one submitted empirical data from a qualified expert to refute what had been determined by both Turk Hill's engineer and the Town of Southeast's engineer (i.e., that post-construction flow volumes and rates will be less than pre-development flow volumes and rates using the proposed storm water best management practices).
Petitioners contend that the Planning Board did not take the requisite hard look and point to alleged deficiencies in the EAF (i.e., the answers in the EAF that the project would not "affect any water body designated as protected" or affect "any non-protected existing or new body of water" or "alter drainage flow or patterns, or surface water run-off"). These answers, petitioners point out, fail to address the central issues: i.e., because the project was disturbing "federal wetlands and altering the site's drainage patterns, [conditions which required] a wetland disturbance permit from the Army Corps of Engineers ("ACOE"), a State Pollutant Discharge Elimination System ("SPDES") permit from DEC and a Storm water Pollution Prevention Plan ("SPPP") permit from DEP." (Reply Memorandum at 5). Petitioners argue that the potential for water contamination was "extremely relevant" to the Planning Board's SEQRA review since the Croton Watershed "has been the subject of extensive regulatory efforts by EPA, DEC, DEP, and the Town of Southeast to reduce pollutant loadings to Croton Reservoirs which continue to be in violation of State Water Quality Standards ("WQS")." (Reply Memorandum at 6).
To prove their points, petitioners refer to correspondence from these agencies dated late August 2003, some 5 months after the Planning Board's issuance of the CND, and arising during Turk Hill's permitting process, as evidence that the Planning Board failed to take the requisite hard look. For example, petitioners argue that the DEP's alleged rejection of Turk Hill's Storm water Pollution Prevention Plan ("SPPP") as incomplete shows that the Planning Board "failed to take a 'hard look' at potentially significant impacts and failed to mitigate those impacts to the maximum extent practicable as required by SEQRA." (Reply Memorandum at 7). However, the DEP's review of a submitted SPPP is not the same review required in connection with a determination of environmental significance. Furthermore, petitioners have provided no [*25]authority to suggest that a lead agency must await all involved agencies' permitting decisions before it may render a determination of significance. And, in any event, the preliminary subdivision approval was expressly conditioned on the approval by the DEP of Turk Hill's SPPP, and therefore, the project may not obtain final approval without an SPPP approved by the DEP.
The record reveals that the Planning Board identified the areas of environmental concern, took a hard look at them, and determined that to the extent there would be a significant impact to the wetland and to the wetland buffers with the placement of the detention basins, the conditions placed in the CND (plantings and a conservation easement) would offset the significance of that impact and actually improve the quality of the man-made wetland.[FN19] Furthermore, the preliminary subdivision approval required that a drainage district be established thereby making the future homeowners responsible for the upkeep and maintenance of the detention basins.
Finally, the Court does not agree with petitioners' argument that the fact that the plans were changed to add a third culvert "overflow culvert" in the existing crossing to the June Brook to control storm drainage [FN20], after the adoption of the CND, evidences the Board's failure to recognize a significant environmental effect. Instead, the Court agrees with respondents' argument that projects may be amended subsequent to the issuance of a negative declaration so long as the changes do not create significant adverse environmental impacts. The addition of another culvert to that area, which already had a bridge and two other culverts, cannot possibly create a significant adverse environmental impact to that area. The reason for the addition was to ensure that emergency vehicles would have access to the homes served by the common driveway crossing the June Brook bridge in the event of a hundred year storm. The fact that the Planning Board's SEQRA review did not get to that level of detail in no way refutes the hard look that was given to the potential significant environmental impacts prior to the adoption of the CND.
Planning Board Did Not Fail to Address Endangered or Threatened Species
In support of its argument that the Planning Board failed to take hard look at the project before issuing its Conditioned Negative Declaration, petitioners point to the fact that "the EAF failed to address whether the site contained '[a]ny species of plant or animal life that is identified as threatened or endangered [e.g., bog turtles].'" (Reply Memorandum at 4). The Court notes that with regard to threatened or endangered species, Part 1 of the EAF states "to be determined" and Part 2 of the EAF responds "no impact" will occur to endangered or threatened species "near the site" or "using the site." (Petition, Exhibit D at 14).
Petitioners argue that given the nature of this property, the Planning Board failed to complete "on-site surveys for state or federally listed endangered, threatened or rare plant or [*26]animal species or species of special concern;" this alleged "failure" per se is evidence of its failure to take the requisite hard look. (Reply Memorandum at 10). However, petitioners were apparently unaware that Turk Hill's wetlands expert, Theodore Kozlowski, had conducted on-site surveys of the site on July 1st and 3rd, 2001 for purposes of a wetland inspection and that he had concluded that the property was "completely unsuitable for bog turtle habitat" given the extent of human disturbance from the previous mining and agricultural activities on the site and the type of wetlands involved (heavily forested and a fast moving stream). (See Affidavit of Theodore Kozlowski, sworn to November 13, 2003 ("Kozlowski Affidavit")). Mr. Kozlowski also contacted the DEC's New York Heritage Program and learned on October 30, 2002 that there were no documented reports of threatened or endangered species at or near the property. (See Letter dated October 30, 2002 from the DEC's New York Natural Heritage Program, Rossi Affidavit at Exhibit G). Mr. Koslowski further avers that "[i]f there were any evidence that the subject property was remotely suitable for bog turtle habitat, I would have reported this information to the Town representatives when I reported my wetlands findings." (See Kozlowski Affidavit).
To begin with, the Court finds fault with petitioners' belated calls for protection of endangered or threatened species since these issues were only raised after the Planning Board had completed its SEQRA review and issued its CND. This is true despite the multitude of letters the Planning Board received from neighboring property owners and environmental organizations (such as the Open Space Coalition and the Clean Water Coalition, petitioners herein), as well as the environmental watchdog Riverkeeper. Thus, it was only Petitioner Delafield [FN21] who first asserted the possibility that there were endangered or threatened flora or fauna that he and his Earth Science students had apparently found on the property during their explorations of that property for a period of eight years during the 1970's to 1980's. (Affidavit of William Delafield, sworn to August 11, 2003 "Delafield Affidavit" at ¶ 7). However, he never alerted the Planning Board of these facts, waiting until April 3, 2003 to alert a separate entity, the SCC, of the possibility of the existence of endangered or threatened species, including the bog turtle. (See Delafield Affidavit, attachment 4(b)).[FN22] Mr. Delafield orally renewed his concerns at the April 24, 2003 SCC meeting concerning Turk Hill's wetlands permit. (Petition, Exhibit T-2). But again, this is a case of too little too late. Such concerns were not a part of the Planning Board's record of its SEQRA review, and while Mr. Delafield suggests that he was cut-off by the Planning Board before he had the opportunity to raise this issue (Delafield Affidavit at ¶ 24), there was nothing to stop him from submitting this issue in writing to the Planning Board in a timely fashion (i.e., before the Planning Board issued its CND).
[*27] Thus, the record reveals that Turk Hill's wetlands expert conducted due diligence with respect to providing information which was then incorporated into the EAF's "no impact" responses to "Will Proposed Action Affect any threatened or endangered species?" and "Will Proposed Action substantially affect non-threatened or non-endangered species?" The Planning Board apparently viewed these answers to be accurate based upon their knowledge of the level of human disturbance that had already occurred on the property from the mining and agricultural uses, and the fact that no one raised the possibility for there being an impact to endangered or threatened species during the course of their SEQRA review. Moreover, the amount of invasion to the wetlands and wetland buffers was relatively minor in comparison to the size of the site and the amount of undisturbed wetlands that would remain and would be preserved through the conservation easement. Finally, respondents are absolutely correct in their argument that while "Bog Turtles and Bog Turtle Habitat have been identified in the easterly quadrant of Putnam County, such an assertion presents no objective evidence that Bog Turtles, or their habitat, is located on-site, or that an off-site habitat would be affected." (Turk Hill's Memorandum of Law in Opposition at 17). Accordingly, the Court finds that the Planning Board fulfilled its obligation to take a hard look at the potential impacts to endangered or threatened species in connection with its SEQRA review, especially since Mr. Delafield's alleged sightings of various threatened species on the site were not brought to the attention of the Planning Board prior to its adoption of its CND resolution.
Based on the foregoing, it is hereby
ORDERED, that petition is hereby dismissed with prejudice.
The foregoing constitutes the Decision, Order and Judgment of the Court.
The Court has considered the following papers numbered 1 to 11 in rendering its decision.
PAPERS NUMBERED
NOTICE OF PETITION, VERIFIED PETITION AND EXHIBITS (VOLS. 1 & 2)1
MEMORANDUM OF LAW, AFFIRMATION, AFFIDAVIT & EXHIBITS2
VERIFIED ANSWER (PLANNING BOARD OF TOWN OF SOUTHEAST)3
CERTIFIED RETURN4
VERIFIED ANSWER (360 TURK HILL CORP.)5
AFFIRMATION IN OPPOSITION, AFFIDAVITS & EXHIBITS6
MEMORANDUM OF LAW IN OPPOSITION7
REPLY AFFIDAVITS8
REPLY MEMORANDUM OF LAW9
CORRESPONDENCE DATED DECEMBER 31, 2002 AND JANUARY 5, 200410
[*28]AFFIRMATION IN SUR-REPLY, SUR-REPLY AFFIDAVITS 11
April 1, 2004 Honorable Mary H. Smith, J.S.C.
James Bryan Bacon, Esq.
Attorneys for Petitioners
169 Main Street
New Paltz, New York 12561
Hogan & Rossi
Attorneys for Respondent 360 Turk Hill Corp.
1441 Route 22, Suite 204B
Brewster, NY 10509
Attn: David Simon, Esq.
Stephens & Charbonneau
Attorney for Respondent Planning Board of the Town of Southeast
1441 Route 22, Suite 204A
Brewster, NY 10509
Attn: Willis H. Stephens, Esq.
Decision Date: April 01, 2004
Footnotes

Footnote 1:This is not the first subdivision application with regard to the property. Thus, it appears that in September 2001, there had been an application to subdivide the property into 16 lots. That application included 3200 feet of roads, a boulevard entrance road and a cul-de sac spur road. Thus, the scope of the proposed subdivision had been substantially reduced from the prior application both in terms of the number of lots proposed (from 16 to 12) and in the amount of roads proposed (from 3200 feet of roads to a 1000 feet cul-de-sac road). (See Letter from Town of Southeast's consultant engineer, Thomas H. Fenton, P.E., dated October 25, 2002 and annexed in Exhibit 3 to Certified Return). 

Footnote 2: A letter dated February 10, 2003 from the Town's Planning Consultant, Graham L. Trelstad, AIP, confirms that the property contains "20.6 acres of wetland and approximately 14.4 acres within wetland control (or buffer) areas. In addition, the property contains approximately 6.5 acres of steep slopes of 15 percent to 25 percent and 3.8 acres of steep slopes greater than 25 percent." Mr. Trelstad further advised the Planning Board that based on the proposed Resource Protection Calculations, the property had 26.9 net acres for building and under the proposed zoning amendments, the subdivision unit count could be no more than 7. But Mr. Trelstad also advised that under the current zoning and Resource Protection Plan Calculations, the property could accommodate up to 18 subdivision units. (Petition, Exhibit M).

Footnote 3:A conditioned negative declaration is defined as "a negative declaration issued by a lead agency for an Unlisted action, involving an applicant, in which the action as initially proposed may result in one or more significant adverse environmental impacts; however, mitigation measures identified and required by the lead agency, pursuant to the procedures in section 617.7(d) of this Part, will modify the proposed action so that no significant adverse environmental impacts will result." (6 NYCRR § 617.2 (h)). 

Footnote 4: The Petition alleges that the loss of wetland and wetland buffers has the potential to displace or destroy endangered and/or threatened species, such as the Bog Turtle and/or its habitat. (Petition at ¶ 8). 

Footnote 5:Petitioners further stress the importance of preventing contamination given recent water quality testing in the Holly Stream, which found that the stream was "non-impacted" the purest rating possible in the New York State Department of Environmental Conservation's stream monitoring program. (Petition at ¶ 37).


Footnote 6: According to the Clean Water Coalition, the placement of detention basins is "harmful to the proper functioning of a wetland. It disturbs the hydroperiod and alters the flow." (See Letter dated April 27, 2003 from Clean Water Coalition to Planning Board, Certified Return, Exhibit 3).

Footnote 7: Given that only 12 single-family homes are proposed for these 68 acres, the Court finds as a matter of law that increases in traffic would be de miminis. Therefore, the Planning Board satisfied its SEQRA obligations even though it did not engage a traffic consultant to conduct a traffic study for this project. 

Footnote 8: These laws were drafted to fulfill the objectives set forth in the new Comprehensive Plan. (See Petition, Exhibits P, R &S). The Town of Southeast also adopted the Croton Plan in April 2003 in response to the New York City Watershed Regulations, and it was designed to "establish a basis upon which the Town of Southeast can affirm its primacy in local land use planning and community development goals." (Petition, Exhibit O at 1-1). 

Footnote 9:As it turned out, while the 4 acre lots conformed with the proposed zoning amendments with regard to lot size, the project did not satisfy either the proposed dimensional standards in the proposed zoning amendments or the Resource Protection Plan density factor which would have reduced the number of lots from 12 to 7. (See Letter dated February 10, 2003 from Graham Trelstad, AICP to Planning Board, Petition Exhibit M). The Town of Southeast's amendments to its subdivision and zoning codes were formally adopted on April 24, 2003. (Petition at ¶ 46 and Exhibits P and Q to Petition). Therefore, these amendments were enacted prior to the end of the SEQRA review period, which formally ended on April 28, 2003 - the expiration of the 30-day CND comment period. (Petition at ¶ 46). 

Footnote 10:As set forth in more detail herein, petitioners contend that the Planning Board failed to send its Lead Agency Notice to the US Army Corps. of Engineers ("ACOE") or the Department of Environmental Conservation ("DEC"), the Putnam County Department of Health, the Southeast Town Board, and the Southeast Conservation Commission. In addition to proving that the Lead Agency Notice was indeed sent to these agencies, respondents further argue that the Southeast Conservation Commission was not an involved agency that required notice pursuant to SEQRA and instead was merely an interested agency. Because the Court finds that respondents have sufficiently established the mailing of the Lead Agency Notice to these agencies, it need not reach the issue of whether SCC was an involved or interested agency. Furthermore, such a distinction is inconsequential so long as the agencies were provided the Lead Agency Notice and EAF and were given the opportunity to comment. (See Matter of Scenic Hudson, Inc. v. Town of Fishkill Town Bd., 266 AD2d 462, app. denied, 94 NY2d 761; Matter of King v. County of Monroe, 255 AD2d 1003, app. denied, 93 NY2d 801). 

Footnote 11:While Mr. Delafield contends he was "cut-off" by Chairman Rohrman before he had an opportunity to raise this issue before the Planning Board, (Affidavit of William Delafield sworn to August 11, 2003 at ¶ 24), it appears that the first time this issue was raised was before the Southeast Conservation Commission in April, 2003. Further, there is no evidence that Mr. Delafield wrote to the Planning Board advising it of his concerns over the endangered or threatened species found on the property. 

Footnote 12:As it turned out, while not relevant to the Court's determination regarding the validity of the Planning Board's SEQRA determination since this information was available subsequent to the Planning Board's March 2003 CND, on June 30, 2003, the SCC decided in favor of recommending that a wetlands permit be issued pursuant to Freshwater and Wetlands Protection Town of Southeast (Local Law #2, section 4.4). With this permit, the following development in wetlands and wetland buffers was sanctioned: (1) the installation of two drainage outlets in the wetlands area; (2) the construction of a wet pond with berm and two drainage outlets in the wetlands area; (3) the installation of an 18 foot wide gravel surface common driveway in the buffer area; (4) the construction of two storm water quality basins and drainage piping in the buffer areas; and (5) the installation of 100 feet of storm drainage piping to the wet pond in the buffer area. (See SCC Letter of Determination dated June 30, 2003, Certified Return, Exhibit 3).

Footnote 13:Petitioners find fault with the Planning Board's failure to conduct a SEQRA review in connection with the waiver. However, petitioners never brought an Article 78 with regard to this decision, and as such, any claims concerning the propriety of this waiver are time-barred by the four-month statute of limitations. (Matter of Young v. Board of Trustees of the Village of Blasdell, 89 NY2d 846). Furthermore, respondents correctly point out that the waiver was not an action subject to SEQRA review. (See Answer at ¶ 31).

Footnote 14: The resolution refers to the following materials as being reviewed by the Planning Board in connection with its SEQRA review:
Full Environmental Assessment Form dated 10/4/02 and signed by John
McNamara, PE of Bibbo Associates, LLP
. The following drawings:
þ PP-1 Preliminary Plat (dated 10/04/02 and last revised 12/18/02)
þ DP-1 Preliminary Design Plan - West (dated 10/04/02 and last
revised ½9/03)
þ DP-2 Preliminary Design Plan - East (dated 10/04/02 and last
revised ½9/03)
þ RP-1 Profiles (dated 10/04/02 and last revised ½9/03)
þ EC-1 Erosion Control Plan - West (dated 10/04/02 and last
revised 12/18/02)
þ EC-2 Erosion Control Plan - East (dated 10/04/02 and last 
revised 12/18/02)
þ D-1 Misc. Details (dated 10/04/02 and last revised 12/18/02)
þ Driveways and Related Details (dated 11/14/02 and last revised ½9/03)
þA Drainage Analysis (dated 10/04/02 and revised on 1/30/03) prepared by Bibbo Associates, LLP


Footnote 15:Respondents argue that the Southeast Conservation Commission was not an involved agency that required notice pursuant to SEQRA and instead was merely an interested agency. Because the Court finds that Respondents have sufficiently established service on these agencies, it need not reach the issue of whether SCC was an involved or interested agency. Furthermore, such a distinction is inconsequential so long as the agency was provided the Lead Agency Notice (and the EAF or EIS) and was given the opportunity to comment on it. (See Matter of Scenic Hudson, Inc. v. Town of Fishkill, 266 AD2d 462, app. denied, 94 NY2d 761; Matter of King v. County of Monroe, 255 AD2d 1003, app. denied, 93 NY2d 801). 

Footnote 16:In support of their argument that the Planning Board failed to complete Part 2 of the EAF, petitioners point to 6 NYCRR § 617.7(d), which states that "[f]or unlisted actions involving an applicant, a lead agency may prepare a conditioned negative declaration (CND) provided that it: (i) has completed a full EAF...."

Footnote 17:Based on the Planning Board's engineering consultant's review of possible alternate sites for the detention basins, it appears that the Planning Board may have complied with this federal regulatory requirement. 

Footnote 18:The Court of Appeals in Matter of WEOK Broadcasting Corp. defined substantial evidence as being "'such relevant proof as a reasonable mind may accept as adequate to support a conclusion or ultimate fact" or "'the kind of evidence on which reasonable persons are accustomed to rely in serious affairs.'" (Matter of WEOK Broadcasting Corp., 79 NY2d at 383; quoting 300 Gramatan Avenue Assocs. v. State Div. of Human Rights, 45 NY2d 176, 180 and People ex rel. Vega v. Smith, 66 NY2d 130, 139).

Footnote 19:In this regard, the Court rejects petitioners' assertion that the CND was invalid because the mitigation measure was unrelated to the project's environmental impact. (Petition at ¶ 166). 

Footnote 20:This amendment occurred as a result of the fact that sometime after the adoption of the CND, it was discovered that the two forty-eight inch culverts serving the June Brook Crossing would "not pass the capacity of the hundred year storm." (See Conservation Commission Minutes dated April 24, 2003 and May 22, 2003, Petition Exhibits T-3 and T-4). To remedy the problem, Turk Hill proposed in May 2003, that an overflow culvert (overflow pipe) be constructed at the bridge that crosses the property leading the rear lots . (Id.) 

Footnote 21:Mr. Delafield is a retired Earth Science Teacher, with his undergraduate degree from Princeton University and Masters Degrees in Chemistry and Earth Science from the University of Illinois.

Footnote 22:However, Mr. Delafield never avers that he has actually seen a bog turtle on the property. Moreover, in a reply affidavit, submitted on behalf of petitioners by Dr. Erik Kiviat, Executive Director of Hudsonia Ltd., sworn to December 16, 2003, there is no assertion that the proposed development would destroy the existence of the endangered species, only that certain specific endangered species do exist in some altered sites and may exist at the Turk Hill site.